MacANDREWS & FORBES HOLDINGS, INC., a Delaware corporation, Plaintiff,

v.

REVLON, INC., a Delaware corporation, Michel C. Bergerac, Simon Aldewereld, Sander P. Alexander, Jay I. Bennett, Irving J. Bottner, Jacob Burns, Lewis L. Glucksman, John Loudon, Aileen Mehle, Samuel L. Simmons, Ian R. Wilson, Paul P. Woolard, Ezra K. Zilkha, Forstmann Little & Co., a New York limited partnership, and Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership-II, a New York limited partnership, Defendants.

Court of Chancery of Delaware, New Castle County.
Submitted: Oct. 18, 1985.
Decided: Oct. 23, 1985.
Revised Oct. 24, 1985.

See also 621 F.Supp. 804.

**1240**

Bruce M. Stargatt, Edward B. Maxwell, II, David C. McBride, and Josy W. Ingersoll of Young, Conaway, Stargatt & Taylor, Stephen P. Lamb, Thomas J. Allingham,

Jr., and Andrew J. Turezyn of Skadden, Arps, Slate, Meagher & Flom, Wilmington, Michael Mitchell of Skadden, Arps, Slate, Meagher & Flom, New York City, for plaintiff.

A. Gilchrist Sparks, III, Lewis S. Black, and Kenneth Nachbar of Morris, Nichols, Arsht & Tunnell, Wilmington, Herbert M. Wachtell, Andrew R. Brownstein, Kenneth B. Forrest, Wayne M. Carlin, and Marc Wolinsky of Wachtell, Lipton, Rosen & Katz, New York City, for defendant Revlon, Inc. and individual defendants.

Michael D. Goldman, Donald J. Wolfe, Jr., James F. Burnett, and Richard L. Horwitz of Potter, Anderson & Corroon, Wilmington, Marc P. Cherno of Fried, Frank, Harris, Shriver & Jacobson, New York City, for defendant Forstmann Little.

Grover C. Brown of Morris, James, Hitchens & Williams, Wilmington, David M. Bernick of Kirkland & Ellis, Chicago, for proposed intervenor Adler & Shaykin.

WALSH, Justice *

At this stage in the contest for control of Revlon, Inc. ("Revlon"), it is necessary to address the scope of the fiduciary duty owed by Revlon's board of directors to its shareholders in the face of a tender offer for any and all shares of the corporation by Pantry Pride, Inc. ("Pantry Pride").

This action was filed by plaintiff MacAndrews & Forbes Holdings, Inc. ("MacAndrews"), an affiliate of Pantry Pride, on August 22, 1985, seeking declaratory and injunctive relief to prevent Revlon's board of directors from issuing Note Purchase Rights ("Rights") to its shareholders.[1] Revlon filed a motion to dismiss or stay this action in favor of a federal court action between the parties, and a hearing on both the preliminary injunction and motion to dismiss was set for September 10, 1985. Due to the rapidly changing nature of this quest for control, Pantry Pride asked to reschedule the hearing on the preliminary injunction, and the argument on defendants' motion to dismiss or stay was heard by this Court on September 10, 1985.

Following Revlon's announcement of a merger agreement with Forstmann Little & Co. ("Forstmann Little"), on October 8, 1985, Pantry Pride filed an Amended and Supplemental Complaint, joining Forstmann Little and the Forstmann Little & Co. Subordinated Debt and Equity Management Buyout Partnership-II as additional defendants. On October 10 this Court denied defendants' motion to dismiss or stay, and this action proceeded.

On October 11, Pantry Pride again sought injunctive relief. Two days later, Revlon announced that it had entered into an amended agreement with Forstmann Little which granted Forstmann Little an option to buy the health care divisions of Revlon. The next day, October 14, Pantry Pride filed a second amended complaint which added claims against Revlon and Forstmann Little challenging the option provisions of the amended merger agreement, the cancellation fee to be paid if the merger failed, and continued to challenge the application of the Rights Plan and restrictive covenants in the Notes to Pantry Pride's tender offer.

On Monday evening, October 14, Pantry Pride sought a temporary restraining order to prevent Revlon from placing into escrow or transferring any assets to Forstmann Little in connection with the amended merger agreement. Although the Court learned during the hearing on the temporary restraining order on October 15 that assets had already been placed in escrow, an order was issued preventing further transfer of assets.

I

This contest for control of Revlon began in June, 1985, when M.C. Bergerac, Chair-

---

* Assigned Pursuant to *Del. Const.* Art. IV § 13(2).

**1.** Although MacAndrews is the named plaintiff in this action, its interests are indistinguishable from those of its parent, Pantry Pride, whose tender offer precipitated the dispute. For all practical purposes the plaintiff will be referred to as "Pantry Pride."

man of the Board and Chief Executive of Revlon, agreed to meet with Ronald O. Perelman, Chairman of the Board and Chief Executive Officer of Pantry Pride. At a meeting on June 17, 1985, Perelman told Bergerac that Pantry Pride was interested in a friendly acquisition of Revlon. Perelman stated that he had considered a price in the $40 to $50 range as fair, but Bergerac countered that this figure was far below Revlon's value. Perelman's attempt to continue discussions of a possible acquisition of Revlon were rebuffed by Bergerac.

Even before Perelman's overture, Revlon's shareholders had approved certain takeover defenses including staggered terms for directors, limitations on consent action and restrictions on the ability of stockholders to propose topics for annual meetings. In addition, at a meeting of the Revlon directors on July 23, 1985, Revlon's general counsel explained the use of "poison pill" Rights Plans to protect shareholders from unfair takeover bids. No action was taken on a Rights Plan for Revlon at that time.

On August 14, Pantry Pride's Board of Directors authorized Perelman to make an offer to acquire Revlon, in a negotiated acquisition at $42 or $43 per share, or in a hostile tender offer for $45 per share. Bergerac replied that Revlon was not for sale, that Perelman's prices were "ridiculous," and that Revlon would be willing to discuss an acquisition only if Pantry Pride agreed to sign a standstill agreement obligating Pantry Pride to desist from an acquisition unless first approved by the Revlon Board.

On August 19, a special meeting of Revlon's directors [2] was called to apprise the directors of the meetings between Bergerac and Perelman. The board decided that the price proposed by Pantry Pride was inadequate, and advised Bergerac to cancel

a meeting scheduled with Perelman for that afternoon. Felix Rohatyn of Lazard Freres, Revlon's investment banker, told the board that he believed that Pantry Pride would finance a tender offer with "junk bonds" and then would sell Revlon's divisions separately to pay the financing and make a profit. He informed the board that his firm's analysis of Revlon indicated that $45 was a grossly inadequate price for Revlon's shares. According to his analysis, if Revlon's divisions could be sold separately, and at the proper time, Revlon could expect to receive between $60 and $70 per share, although somewhat less should be expected if Revlon were sold in one piece.

At the same meeting, Martin Lipton, special counsel for Revlon, recommended that the directors adopt a two-part program that he had developed with Revlon's management and investment bankers to maximize and protect the value of Revlon's shares when faced with a tender offer. First, he recommended that the Revlon Board authorize the company to repurchase up to five million of the nearly 30 million shares of its own common stock. Next, he recommended that the board adopt a Note Purchase Rights Plan. This Rights Plan provided that Revlon's shareholders would receive one Note Purchase Right as a dividend on each share of common stock. These Rights would entitle the holder to exchange one share of common stock for a $65 principal amount of Revlon notes that would pay 12% interest with a one year maturity.

The Rights would be triggered when anyone acquired beneficial ownership of 20% or more of Revlon's shares, unless the acquiror promptly announced and consummated a transaction to buy Revlon's shares for cash at $65 or more. The plan also provided that no Rights certificates could be issued to or exercised by the acquiror, and the Plan allowed Revlon's board to

---

**2.** Revlon's board is composed of 14 directors. Six of the directors are currently holding prominent positions in Revlon's management. Two of the remaining directors hold significant blocks of Revlon stock, and most of the non-management directors are or have been associated with entities doing business with Revlon.

redeem the Rights for 10¢ each at any time prior to an acquisition of 20% or more. To the extent that statutory or contractual restrictions prevented the exchange of debt securities for stock, the Rights would be exercised for debt on a pro rata basis.

Although the Rights were designed to prevent tender offers at less than $65 per share and to encourage potential acquirors to negotiate with Revlon's board, Rohatyn noted that if the Rights were put in place, liquidation of the company was likely to follow.

The Revlon Board unanimously adopted the two-part plan proposed by management, Lazard Freres, and Lipton, and authorized the company to purchase up to five million shares of its common stock, and to declare a special dividend of one Note Purchase Right for each outstanding share of common stock. The board also authorized Revlon's management to initiate suit against Pantry Pride alleging violations of Federal securities laws.

At this point, the battle lines were drawn. On Friday, August 23, Nicole Acquisition Company (a wholly-owned subsidiary of Pantry Pride) commenced a tender offer for any and all shares of Revlon's common stock at $47.50 per share.[3] This initial tender offer was subject to a number of conditions, including Pantry Pride's ability to obtain financing to purchase the shares, and the rescission, redemption, or voiding of the Rights Plan. In addition, Pantry Pride's offer provided that if Pantry Pride was unable to consummate a merger with Revlon within nine months from the time that shares were purchased, Pantry Pride could make no assurance that it would be able to purchase and pay for the remaining Revlon shares.

On August 26, Revlon's board of directors met and concluded that Pantry Pride's offer was grossly inadequate and encouraged stockholders to reject the of-

fer. As an alternative, management recommended its own exchange offer. Pursuant to this exchange offer, Revlon offered to purchase up to 10 million shares of its common stock by exchanging Senior Subordinated Notes (the "Notes") (bearing 11.75% interest, due 1995) with a $47.50 principal amount and one-tenth of a share of $9.00 Cumulative Convertible Exchangeable Preferred Stock, with a value of $100 per share, for each share of common stock tendered to Revlon. This offer would increase Revlon's debt by $475 million, and since the shareholders' equity would be reduced, the value of the shares not tendered in the exchange was likely to drop. The exchange offer was commenced on August 29, and by September 13, Revlon had accepted 10 million of the shares tendered by approximately 87% of Revlon's shareholders.

The Notes contained covenants that were intended to deter Pantry Pride and other potential bidders from commencing a tender offer. These covenants severely limited Revlon's ability to incur additional debt and to sell assets or pay dividends unless Revlon's "independent directors" approved the sale or dividend.[4] The Revlon Board unanimously agreed not to redeem the Rights to facilitate Pantry Pride's initial tender offer.

On September 13, after Revlon had accepted 10 million shares in its exchange offer, Pantry Pride terminated its initial tender offer. Three days later, however, Pantry Pride commenced a new tender offer for Revlon shares. This time, Pantry Pride's offer was not contingent on the redemption, rescission, or voiding of the Rights Plan, nor was it contingent on removal of the covenants on the Notes from the exchange offer. Instead, Pantry Pride's offer was conditioned upon receiving at least 90% of the Revlon shares. In its second offer, Pantry Pride covered the

---

**3.** This tender offer included $26.67 per share for preferred stock.

**4.** The term "independent directors" included the non-management members of Revlon's board and the successors whom they nominated and elected.

risk that 10% of the Rights would remain by offering to take at least 90% of the shares for $42.00 per share. Pantry Pride's second offer also indicated that if Revlon would redeem the Rights, or the Rights were declared invalid, Pantry Pride would consider removing the 90% minimum and might increase the price paid for the shares.

Meanwhile, unknown to Pantry Pride, Revlon had been negotiating with Forstmann Little and Adler & Shaykin to arrange a leveraged buyout of Revlon. At their regularly scheduled board meeting on September 24, Revlon's directors rejected Pantry Pride's offer and authorized management to undertake negotiations with other parties which might lead to a tender offer, merger, or sale of the assets of the company. On September 27, Pantry Pride offered $50 per share for a merger agreement with Revlon, and raised this offer to $53 per share on October 1.

On Thursday, October 3, the Revlon Board met to discuss alternatives to Pantry Pride's offer to merge at $53 cash per share. The Revlon Board considered and unanimously approved a plan to enter into a leveraged buyout agreement with Forstmann Little in which each shareholder would receive $56 cash per share with Revlon's management given an opportunity to acquire an equity interest in the corporation. In connection with this leveraged buyout, Forstmann Little agreed to assume Revlon's $475 million debt incurred from issuing the Notes in the Exchange Offer, and Revlon agreed to redeem the Rights and lift the Note covenants for Forstmann and any other offer to acquire Revlon's shares for more than $56 in cash. To help finance Forstmann's transaction, Revlon agreed to sell its Norcliff Thayer and Reheis divisions to American Home Products for $335 million, and to sell the Beauty Products Division to Adler & Shaykin in an independent transaction for approximately $900 million.

Following Revlon's announcement of its intention to accept Forstmann Little's proposal, which waived the covenants on the Notes limiting Revlon's ability to incur additional debt, the value of the Notes began to drop. Between the October 3 announcement and October 12, the Notes had dropped from $100 to as low as $87, a decline of about $60 million below par. This 10–13% discount on the Notes prompted strong reaction from irate Noteholders who had exchanged their shares for Notes which they believed would trade at par value. By October 12, Revlon's directors had become concerned with restoring the value of the Notes.

On Monday, October 7, 1985, Pantry Pride again raised its offer by amending its $42 tender offer to increase the price paid to $56.25 per share in cash. This offer was subject to the redemption or voiding of the Rights, waiver of the covenants in the Notes and Preferred Stock issued in the Revlon Exchange offer, and placement of three Pantry Pride directors on Revlon's board as "independent" directors. On Wednesday, October 9, Pantry Pride met with Forstmann Little (with representatives of Revlon present) to determine whether an arrangement could be made to divide Revlon between Pantry Pride and Forstmann, but no agreement could be reached. At this meeting, Perelman informed Forstmann that Pantry Pride was prepared to counter every Forstmann offer with a nominal raise.

On Friday, October 11, Forstmann met with representatives from Wachtell, Lipton, and Lazard Freres and proposed to raise Forstmann's bid to $57.25 cash per share in the merger. In return for this additional consideration, Forstmann demanded that it be given a "lock-up" option to purchase the Vision Care and National Health Laboratories divisions of Revlon for $525 million, which could be exercised by Forstmann Little when any person or group acquired 40% of Revlon's shares. Forstmann Little's new merger agreement maintained the waiver conditions of the first merger agreement—that the Rights Plan be lifted and the covenants on the Notes be rescind-

ed. In addition to the increase in price, Forstmann offered to exchange new senior subordinated increasing rate notes due in 1995 for all of Revlon's 11.75% Notes given in the exchange offer. Thus, Revlon would be able to boost the value of the substantially discounted Notes it had issued in its exchange offer. Finally, the new offer was conditioned on being accepted at the October 12 board meeting of Revlon.

On Saturday, October 12, Revlon's directors met and concluded that Forstmann Little's latest offer was more favorable to Revlon's shareholders than Pantry Pride's tender offer at $56.25 because Forstmann Little's offer was for a higher price, it protected the Noteholders, and its financing was firmly in place. The Board voted unanimously to accept Forstmann Little's offer of $57.25 per share, coupled with the exchange offer to protect Revlon's Noteholders. The board also resolved to redeem the Rights and to waive the covenants on the $9 preferred shares in connection with any offer, by anyone, in which Revlon's shareholders would receive more than $57 in cash. In addition, the board acted to waive the covenants on the 11.75% notes so long as Revlon's investment banker (Lazard Freres) or two other prominent bankers gave an opinion stating that after an offer were consummated, the Notes would trade near par value.

Pantry Pride received Revlon's amended merger agreement on October 14, 1985, and sought and secured a temporary restraining order in this Court to prevent Revlon from transferring the assets involved in the lock-up option and cancellation fee into escrow.

At 5 p.m. on October 18, within three hours of the conclusion of oral argument on the present motion, Pantry Pride announced that it had increased its offer to $58 cash for any and all shares of Revlon and that it would match Forstmann Little's support of the Notes.

## II

Pantry Pride's original complaint, which sought to invalidate the Revlon Rights Plan, has since been twice amended to reflect the permutations in Revlon's takeover defenses. The second amended complaint which forms the basis for the present request for a preliminary injunction focuses primarily on the October 12 transaction but seeks to invalidate the original Rights Plan as well. Thus, Pantry Pride requests that its $58 tender offer be permitted market circulation free of the restrictions imposed by the Rights Plan *ab initio*, the restrictive covenants of the Exchange Offer Notes and the lock-up sale of assets.[5] It also seeks a ruling that the Rights Plan and the restrictive covenants were effectively waived through the Forstmann Little merger agreement and that the $25 million cancellation fee to be paid by Revlon to Forstmann Little is void.

The Revlon defendants, invoking the business judgment rule, contend their response to Pantry Pride's takeover designs from the first friendly overture and continuing to the October 12 agreement with Forstmann Little has been the product of an informed effort to serve the best interests of all its corporate constituencies, including its shareholders. Forstmann Little defends its actions as a white knight as

---

5. Pantry Pride's broad ranging attack on the sale of Revlon's assets has prompted the appearance of counsel for Adler & Shaykin, the entity which agreed to purchase Revlon's beauty care division as part of the October 3 leveraged buyout transaction with Forstmann Little. This agreement, which is not subject to shareholder approval and which has not been independently attacked by Pantry Pride, has, nonetheless, been "lumped" with Forstmann Little's lock-up agreement for the purchase of Revlon's health care units in support of Pantry Pride's argument

that, in the aggregate, Revlon is disposing of a substantial portion of its assets in a continuous liquidating transaction without shareholder approval. The merits of that transaction, however, are not ripe for present determination. Since Pantry Pride does not now seek to invalidate the Adler & Shaykin transaction it will not be reviewed in the context of the present application for injunctive relief. Accordingly, a ruling on Adler & Shaykin's motion to intervene is deferred pending future developments.

performing an indispensable role in insuring competition in a fast-moving takeover situation with substantial financial benefit to Revlon shareholders.

## III

 Of necessity, the starting point for an analysis of Revlon's conduct must be the application of the business judgment rule. As the result of recent decisions of the Delaware Supreme Court which applied the business judgment rule in the context of responses to acquisition attempts, certain standards of director conduct have evolved. Directors faced with the decision to accept or reject a merger agreement must exercise informed business judgment, even where there are no allegations of self-dealing. *Smith v. Van Gorkom*, Del. Supr., 488 A.2d 858 (1985). In the face of a hostile acquisition, the directors have the right, even the duty, to adopt defensive measures to defeat a takeover attempt which is perceived as being contrary to the best interests of the corporation and its shareholders. *Unocal Corp. v. Mesa Petroleum Co.*, Del.Supr., 493 A.2d 946 (1985). But even an informed board may not exercise unbridled discretion. An element of balance is required to insure that the measure adopted is reasonably designed to meet the posed threat. *Unocal*, 493 A.2d at 955. This balance overlay must be applied to the particular circumstances of each situation, in order to gauge the reasonableness of the response against the perceived threat.

The Revlon Board made a series of judgments, which individually and collectively contributed to the board's final commitment to Forstmann Little's October 12 merger proposal. Whether "Draconian" or not, the finality of that agreement with its asset lock-up and "no-shop" feature effectively ends the bidding for Revlon. That agreement, however, was the result of the prior takeover responses made by the Revlon board which must be separately tested under the business judgment rule.

 Although there was preliminary sparring between Perelman and Bergerac beginning in June, 1985, with Perelman taking a friendly approach, the first significant reaction by Revlon's board was its consideration of a Rights Plan at its July 23 meeting. This plan was adopted at its August 19 meeting after the board was satisfied that Perelman was intent on pursuing a tender offer at a price the board considered grossly inadequate, (in the low-to-mid-$40 range). The board's concern that Pantry Pride, a relative newcomer to the takeover scene with no track record, would resort to "junk bond" financing supported by an eventual breakup of Revlon in order to buy the company cheaply, supports its conclusion that the adoption of a rights plan or "poison pill" device was required. While I harbor some doubt about the "independent director" feature of the Rights Plan, in general terms its adoption falls within the business judgment rule as a prospective device calculated to strengthen the board's bargaining position. *Moran v. Household International, Inc.*, Del.Ch., 490 A.2d 1059 (1985); *appeal pending*, Del. Supr., No. 37, 1985. I thus reject Pantry Pride's claim that the Revlon Rights Plan is void *ab initio*.

But having adopted the Rights Plan the Revlon Board reached the plateau of plenary negotiating authority which *Household* envisioned. The Revlon Board thus assumed a great degree of responsibility by providing a substitute for the marketplace which ordinarily would judge the merits of Pantry Pride's, and any other potential acquiror's, tender offer. This role took on added significance here since each of Pantry Pride's subsequent tender offers were "any and all for cash." Though the conditions of these offers varied to accommodate Revlon's various defensive measures, the essential term of paying cash, in increasing amounts, for all shares tendered remained the same. Thus from the outset the Revlon Board was dealing with a bidder whose offers were calculated to treat all shareholders equally with no risk that certain shareholders would be "squeezed out."

██ The second definitive takeover defense adopted by the Revlon Board, the Exchange Offer, was defensible under the circumstances at the time, although it later proved to be a source of embarrassment to the directors. The Exchange Offer under which Revlon offered to purchase up to 10 million of its own shares in exchange for a combined security of 11.75% Subordinated Notes and 1/10 of a share of Cumulative Preferred Stock was thought to produce a security having a face value of $57.50 per share. This device, announced at a time when Pantry Pride's original offer was still outstanding, stalled the Pantry Pride offer while at the same time increasing the value of Revlon's exchanged shares by approximately 25%. Additionally, the restrictive covenants which had been imposed for the benefit of the Noteholders, but which could be waived by the Independent Directors of Revlon, rendered a leveraged buyout by an unfriendly suitor highly unlikely. The deterrent effect of the Exchange Offer is evidenced by the fact that it caused Pantry Pride to lower its tender offer to $42 conditioned upon a 90% participation.

When, in late September, Pantry Pride increased its offer to $53 a share, conditioned on the redemption of the Rights and the waiver of the Note covenants, it became clear to Revlon that Pantry Pride would not fade away and its substantial increase in the ante required the Revlon Board to consider what previously was unthinkable—the breakup of Revlon. Up to that point it may be fairly concluded that defensive reactions of the Revlon Board were based, in large part, upon preservation of Revlon in its corporate form, although Bergerac had apparently discussed a leveraged buyout with Forstmann some months ago. From late September on, as events of the next two weeks indicated, the Revlon Board proceeded on the assumption that there would be a breakup of the company. The directors' role changed from that of a board fending off a hostile acquiror bent on a breakup of the corporation to that of an auctioneer attempting to secure the highest price for the pieces of the Revlon enterprise. Significantly, from this point on, the Revlon Board permitted considerations other than price to dictate its approach.

In entering into three-cornered negotiations with Forstmann Little and Adler & Shaykin, Revlon was committed to the corporate breakup it had sought initially to avoid. Revlon did not, however, invite Pantry Pride to participate on the same level of negotiation. Revlon's management did not, for instance, share financial data with Pantry Pride as it did with Forstmann Little. While Revlon permitted its lawyers and investment bankers to "explore" avenues for a deal, it never invited Pantry Pride to the board room or permitted Pantry Pride to make a face-to-face presentation to the entire Revlon Board. In embracing Forstmann Little as its merger partner, Revlon knew that it was not merging with an operating company but with a firm which specialized in leveraged buyouts. That white knight did not have a long term "home and family" relationship in mind.

The October 3 agreement with Forstmann Little contained a $56 per share price, which topped Pantry Pride's $53 offer, but Forstmann Little's offer proposed a leveraged buyout in which Revlon's management could become 25% equity participants using the proceeds of the golden parachutes which the buyout merger was designed to trigger. Revlon's independent directors not only raised no objection to this preference but agreed to waive the Note covenants to permit it to occur.

Pantry Pride's response to the October 3 agreement was a formal amendment of its tender offer which raised the offering price to $56.25 a share subject to receiving the same redemption and waiver concessions granted Forstmann Little. Although the Forstmann Little offer had been increased by only $.25, the significance of Pantry Pride's offer was that the shareholders and the investment market now had formally before them competing offers cast in the same essential terms. The apparent mar-

ket reaction seemed to view Pantry Pride's offer to pay for tendered shares in cash by October 21 superior to Forstmann Little's agreement to pay $56 which, when discounted for later payment of at least 35 days, yielded a lower price. There was also adverse reaction to the waiver of the Note covenants. By October 12, the threat of litigation by the Noteholders was genuine and a source of concern to the outside directors, some of whom had retained separate counsel.

When measured against shareholder benefit, the October 12 decision of the Revlon Board to modify the October 3 agreement with Forstmann Little seems highly questionable. In exchange for securing an additional $1 per share, the board (1) granted a lock-up option to Forstmann Little to acquire the health aid divisions for a price at least $75 million below the lowest estimate of Revlon's own investment banker who opined that the price was favorable to Forstmann Little but did not characterize it from Revlon's viewpoint and (2) conceded a "no-shop" provision which prevented the Revlon Board from entertaining further bids from any third party, including Pantry Pride, and ended the negotiating role the board had used as the initial rationale for its poison pill devices.

What motivated the Revlon directors to end the auction with so little objective improvement? Revlon's repeated claim that it favored Forstmann Little at every stage because Forstmann Little seemed better able to finance its acquisition does not withstand hard analysis. Neither Pantry Pride nor Forstmann Little could have acquired Revlon without a breakup of its components and neither was interested in preserving the corporation with all its previous constituencies intact. Indeed, the participation of Adler & Shaykin to provide almost one-half of the total purchase price through its acquisition of the beauty care division was a vital part of the Forstmann Little plan.

With the exit of Revlon's management from the October 12 transaction, Forst-

mann Little was left with the need to raise approximately $400 million before it could consummate the transaction. Forstmann Little's investment banker, Goldman Sachs, assured the Revlon Board of its ability to do so. To support its $56.25 tender offer Pantry Pride was required to raise $700 million, which its investment banker, Drexel Burnham Lambert, claims to have had fully committed, subject to the removal of the same financing restrictions which impeded the Forstmann Little financing. Even though the Revlon Board apparently viewed the Drexel Burnham approach as "junk bond" financing, in an any and all cash offer (unlike a two-tiered offer) such a consideration should seem of little concern to shareholders when the offering price is attractive.

The Revlon Board seemed to want Forstmann Little in the picture at all costs. Forstmann Little made its terms for a new deal "non-negotiable." In the face of Pantry Pride's $.25 raise, Forstmann Little indicated that it did not want to get involved in fractional bidding and required an irrevocable commitment to insure its continued presence. That presence seemed vital to the Revlon Board for another, and perhaps dispositive reason: it provided an opportunity to ameliorate the problem of the Noteholders which had been caused by the waiver of covenants included in the October 3 agreement.

This also resolved a problem for the directors themselves—a problem that had ripened into litigation. Although the directors had been assured by counsel that there was no basis for liability based on disclosures made at the time of the exchange offer, the failure of the Notes to maintain their value was an economic fact, directly attributable to the waivers contained in the October 3 leveraged buyout agreement in which management was granted an equity position. Indeed, the importance of doing something for the Noteholders is evidenced by the fact that Revlon's investment banker initiated an inquiry with Pantry Pride to determine Pan-

try Pride's plans to protect the value of the Notes.

Revlon defends Forstmann Little's commitment to the value of the Notes in exchange for the lock-up as securing protection for another corporate constituency to which it had a moral, if not a legal obligation. At oral argument, Revlon's counsel claimed that Forstmann Little's support for the value of the Notes added $2.25 per share to the value of the deal. Undoubtedly, the support for the Notes resulted in a significant financial benefit to the Noteholders. But at whose expense? Certainly not the board's, who used it to rid itself of a vexing and potentially damaging source of litigation.

██ Although the predicament of the Noteholders was genuine, it arose from voluntary participation in the Exchange Offer—a device fashioned by the Revlon directors to provide increased value to the shareholders. Even though the Notes were still in the process of being issued and even though some of the Noteholders continued to be shareholders, their rights had been fixed as a matter of contract. *See Harff v. Kerkorian,* Del.Ch., 324 A.2d 215 (1974).

██ The board's primary responsibility after the exchange offer was to bargain for the rights of the remaining equity holders. By agreeing to a lock-up and no shop clause in exchange for protecting the rights of the Noteholders, the Revlon Board failed in its fiduciary duty to the shareholders. The board may have been informed, but its performance did not conform to the other component of the business judgment rule—the duty of loyalty. The board's self-interest in resolving the Noteholders' problems led to concessions which effectively excluded Pantry Pride to the detriment of Revlon's shareholders. Thus, the element of loyalty may turn, as it does here, in the selection of a takeover defense or a bargaining device that is not proportionate to the objective needs of the shareholders but merely serves the conve-

nience of the directors. *Unocal,* 493 A.2d at 955.

██ A lock-up agreement is not *per se* illegal and its use as a bargaining tool to encourage the participation of a prospective bidder has been approved. *Thompson v. Enstar Corp.,* Del.Ch., C.A. No. 7641 Hartnett, V.C., (June 20, 1984). A lock-up provision, however, must advance or stimulate the bidding process, not retard it, and toward that end the interests of the shareholders are best served through encouraged competition. *See Id.,* slip op. at 12; Note, *Lock-Up Options: Toward A State Law Standard,* 96 Harv.L.Rev. 1068, 1079 (1983). Where, as in *Enstar,* there is only one genuine bidder in the picture and there is a risk of losing his participation in a fast-moving situation, the quick action of directors in granting an option on substantial corporate assets will not be second-guessed under the business judgment rule. Where, however, the lock-up option is extended to foreclose further bidding in an active bidding situation and to promote an agreement which relieves the directors of the potentially damaging consequences of their own defensive policies, a different result follows. The business judgment rule does not protect such action. Having assumed the role of primary negotiator through the restriction on the alienability of shares, the directors must demonstrate the rationality of their decisions. On the present record and in view of their apparent self-interest such a showing has not been made.

Undeniably, the Revlon directors, through extensive negotiations, though tilted in favor of one bidder, have achieved a significant premium in the value of Revlon's shares since Pantry Pride's initial approach—from $42 to $57.25, and now to $58 per share. This achievement is to their credit. Once the breakup of Revlon became inevitable there was little risk that the board's conduct was entrenchment-based. But the recognition of breakup also required the board to view its primary role as the promoter of bids, with price the

dominant consideration. To the extent the board permitted other considerations to dictate its approach it failed in its fiduciary duty to the shareholders who were not free to directly bargain with their shares.

## IV

 Having determined that Pantry Pride has demonstrated the reasonable probability that it will ultimately succeed in demonstrating that the lock-up option was, under the circumstances, a usurpation of directorial authority, I turn to the remedy required. *See e.g., Weinberger v. United Financial Corp.*, Del.Ch., 405 A.2d 134, 137 (1979); *Sandler v. Schenley Indus., Inc.*, Del.Ch., 79 A.2d 606, 610 (1951); *Allied Chemical & Dye Corp. v. Steel & Tube Co.*, Del.Ch., 122 A. 142 (1923). Although it has been concluded that the Rights Plan is not void *ab initio*, having served to permit the Revlon board full negotiating power, it cannot now stand in the way of the bidding process. The Revlon board tacitly conceded this result in its October 3 agreement and it now views the Rights Plan as moot. Similarly, having waived the Note covenants for Forstmann Little with the professed expectation that other bidders might emerge, the Revlon Board cannot, in the interest of fairness and in compliance with its fiduciary duty, fail to do the same to accommodate a bid which, on its face, is presently higher. *See Wilmington Trust Co. v. Coulter*, Del. Supr., 200 A.2d 441 (1964). Thus Pantry Pride is entitled to market its latest bid without the entanglements of the Rights Plan and the Note covenants. In any event, since Pantry Pride has now joined Forstmann Little in agreeing to support the value of the Notes, the purpose for the Note covenants appears satisfied.

 Pantry Pride now has a new tender offer in circulation. It is not clear whether it merely wishes to market that offer free of Revlon-imposed entanglements or whether it wishes to further negotiate with the Revlon Board. The function of the Court is not to define the terms of negotia-

tions in advance nor even to suggest further negotiation if, in the board's judgment, further negotiations with either party are not in the interests of the shareholders. But to the extent that the existence of the no-shop provision is viewed as an inhibition to further negotiations, it should not prevent the Revlon Board from further activity if it were so inclined. I view the no-shop provision as cut from the same cloth as the lock-up option which was calculated to foreclose further bidding by Pantry Pride. Since the latest bid by Pantry Pride should be considered by Revlon's shareholders on its own merits, the no-shop clause should not stand in the way of further participation by Revlon's board in discharge of its fundamental duty to protect the shareholders. *Unocal*, 493 A.2d at 954.

From the standpoint of irreparable harm, unless Pantry Pride is permitted to market its bid free of the restrictions imposed by the lock-up option, with its triggering mechanism, its acquisition effort is at an end. In terms of relative hardship to the parties the need for both bidders to compete in the marketplace far outweighs the limiting of Forstmann Little's contractual rights. Revlon is always free, of course, to renew the bidding on other terms. In short, more bidding activity, not less, should control developments in what has become a sale of assets.

## V

Pantry Pride also seeks to enjoin the payment of the $25 million cancellation fee hastily placed in escrow on October 14. Pantry Pride views this payment as a waste of corporate assets since the amount involved is in addition to the expenses Forstmann Little is entitled to receive from Revlon in the event the transaction is not completed. The real purpose for the payment, it is contended, is simply to make the transaction more expensive to Pantry Pride in order to discourage further bidding.

 Even though the timing of the escrow of the cancellation fee along with the

lock-up assets is disturbing, the present record does not permit a categorical ruling on the merits of the cancellation fee. A cancellation fee, *per se*, is not unusual in transactions of this magnitude. Moreover, the October 3 agreement also provided for a cancellation fee in the same amount. The link between the escrow of the lock-up assets and the cancellation fee suggests, however, that Forstmann Little and Revlon considered the two as combined security to secure the exclusion of Pantry Pride from further participation. Since the asset lock-up will now be enjoined it is appropriate to preclude distribution of the cancellation fee until the merits of that aspect of the dispute have been resolved.

## VI

Since the asset lock-up will be enjoined on the ground of usurpation of directorial authority, it is unnecessary to grapple with the question of whether the proposed sale of Revlon's health care divisions, separately or together with the sale of the Beauty Products division, requires shareholder approval under 8 *Del.C.* § 271. There is now no immediate prospect that the Health and Vision Care units will be transferred. Therefore, in the context of the present motion it is not necessary to make definitive rulings respecting those transactions.

An appropriate order should be submitted. In the interim, the temporary restraining order issued October 15, 1985, remains in effect.