511 A.2d 501

**Theodore N. LERNER et al.**

v.

**Lawrence E. LERNER.**

**No. 133, Sept. Term, 1985.**

Court of Appeals of Maryland.

July 15, 1986.

Jacob A. Stein (Stein, Mitchell & Mezines, Washington, D.C., James L. Thompson, Miller, Miller & Canby, Albert D. Brault, Brault, Graham, Scott & Brault, William J. Rowan III, Rowan, Abell, Quirk & Quinn, Rockville, of counsel and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D.C., on brief), for appellant.

Arnold M. Weiner (Price O. Gielen, Ethan L. Bauman, Neile S. Friedman and Melnicove, Kaufman, Weiner & Smouse, P.A., on brief, Baltimore and James J. Cromwell, Beckett, Cromwell & Myers, on brief, Bethesda), for appellee.

Argued before MURPHY, C.J., and SMITH, ELDRIDGE, COLE, RODOWSKY, COUCH and McAULIFFE, JJ.

RODOWSKY, Judge.

This appeal is from an order enjoining, pending decision on the merits, a reverse stock split by which the holder of 73.68% of the outstanding stock in a Maryland ordinary business corporation proposes to cash out the 26.32% interest of the other stockholder. We shall affirm for reasons having more to do with the law of preliminary injunctions than with the law of minority freezeouts.

Lerner Corporation (the Company) is owned by two brothers, the antagonists Theodore N. Lerner (Theodore) and Lawrence E. Lerner (Lawrence). Over the years and through a number of entities Theodore and Lawrence have successfully invested in, developed, and managed real estate in the metropolitan Washington, D.C. area. The Company manages real estate, including acting as rental agent. Most of the properties managed by the Company are owned to the extent of 50% or more by Theodore and Lawrence and their families. For the fiscal year ending May 31, 1984,

the Company had operating revenues of $2,074,900 consisting of fees from two shopping malls, two mixed-use retail strip and office centers, nine apartment complexes, and three office buildings. As of that date one or more projects were in progress which the Company was also to manage.

The Company was organized in 1965. It is a Subchapter S corporation. Its authorized and outstanding capital is 95 shares of no par common stock. Theodore owns 70 shares and Lawrence owns 25. Theodore is and always has been president and one of the three directors. Prior to September 1983, Lawrence was the Company's secretary and a director. Theodore has been active in almost all phases of the Company's business other than actual construction, while Lawrence's area of prime responsibility has been construction management. Both brothers took salaries from the Company before the distribution of profits. Theodore says that Lawrence in 1977 began spending six months each year in Florida. Lawrence says that this is on doctor's orders because Lawrence sacrificed his health in the service of the Company.

We can present the picture of this case in broad strokes. The brothers had a falling out. In September 1983 Theodore caused Lawrence to be removed as an officer and director. In April 1985, Lawrence sued Theodore. Then Theodore had Lawrence removed from the payroll and undertook to freeze Lawrence out as a stockholder. Lawrence countered by bringing the instant action to enjoin the freezeout.

In this injunction case Lawrence alleges that the Company's business included locating and developing real estate investment opportunities in addition to property management. Lawrence claims that in April 1983 he learned that he had been excluded from the benefit of investment opportunities which had been developed through his efforts and through the expenditure of resources of the Company. Lawrence began questioning Theodore and this led to Theodore's removing Lawrence in September from the board and

corporate office. Thereafter Theodore, his wife Annette, and his son Mark, have been the Company's directors. In November 1983 the Company engaged a New York consultant to value Lawrence's shares. The initial report valued his 25 shares at $241,000 as of March 16, 1984.

On April 9, 1985, Lawrence sued Theodore, the Company, Annette, and Maurice M. Myers, the chief financial officer of the Company (the April Suit). Of its nine counts only the first and last deal with the brothers' relationship in the Company. Count I is a shareholder's derivative action claiming Theodore diverted real estate opportunities from the Company. Count IX asserts that Theodore utilized his control "in an illegal, oppressive and fraudulent manner" and that corporate assets will be further wasted. That count seeks appointment of a receiver for the Company and its complete dissolution.

Two days after the April Suit was filed Theodore took Lawrence off the Company's payroll. The April Suit attracted newspaper publicity, particularly an article in the *Washington Post* of May 14, following which Theodore put in motion the mechanics of the freezeout of Lawrence. Theodore testified that the purpose of the freezeout was to protect the business of the Company from the consequences of a dissonant shareholder. Based on the history of the brothers' relationship, into which the trial court would not delve at the hearing on a preliminary injunction, Theodore said he foresaw Lawrence challenging basic business decisions, *e.g.*, salary increases. Theodore said he foresaw the morale and productivity of key employees and the Company's ability to retain key employees adversely affected by turmoil generated by the minority shareholder as illustrated by the April Suit, particularly with its claim for dissolution of the Company. Theodore and two experienced real estate investors (one Mark's father-in-law and the other a prospective joint venturer with Theodore in two shopping center projects) each opined that the word of mouth and newspaper notoriety about dissension in the Company would cause prospective customers to prefer other managers in the

highly competitive metropolitan Washington market. Theodore in substance said that he concluded that all connection between the Company and Lawrence had to be severed in order to counter those effects and to allow the Company to prosper.

The mechanics of the freezeout are a reverse stock split. By a notice dated May 17, 1985, the Company called a special meeting of the stockholders for May 28, 1985, to consider amending the articles of incorporation. Among the exhibits attached to that notice was a report dated April 15, 1985, in which the same consultant valued Lawrence's 25 shares as of March 31, 1985, at $438,000. At the shareholders' meeting Theodore would vote his 73.68% of the outstanding stock to amend the charter (1) to reduce the authorized capital from 95 shares to 2 shares, and (2) to reclassify each existing share of the Company's stock into $\frac{1}{35}$th of a share of common stock. A reverse split at that ratio would result in Theodore's owning two shares, the total authorized stock, while Lawrence would hold five-sevenths of a share. The proposed articles of amendment further would have prohibited fractional shares and would have provided for cash payment by the Company in lieu of fractional shares. The notice of shareholders' meeting further advised Lawrence of the existence of appraisal rights and of the procedure for invoking appraisal.

By the above procedures Theodore would have cashed out Lawrence's stockholding in the Company. There is no contention before us that the contemplated procedures outlined above violate any *express* provision of the corporation statutes, Md.Code (1975, 1985 Repl.Vol.), Corporations and Associations Article.[1]

---

1. All references to the Md.Code are to the Corporations and Associations Article unless otherwise specifically indicated.

Section 2–604 permits charter amendments on the advice of the board and upon stockholders' approval by a two-thirds vote. Section 2–214(a)(4) permits a Maryland corporation to "[p]ay cash for the fair value of a fractional share of stock determined as of the time when the person entitled to receive it is determined[.]"

On the day before the stockholders' meeting was to be held Lawrence filed the instant injunction action in the Circuit Court for Montgomery County (the May Suit). By agreement of counsel the stockholders' meeting was postponed until the court could rule on Lawrence's application for an interlocutory injunction. Defendants in the injunction action are the Company, Theodore, and the other two directors, Annette and Mark. After a two day hearing at which some testimony was elicited between the arguments of counsel, the court enjoined the stockholders' meeting until decision on the merits.

The defendants appealed and petitioned this Court for certiorari. We issued the writ prior to consideration of the matter by the Court of Special Appeals.

In speaking of preliminary injunctions we said in *State Department of Health and Mental Hygiene v. Baltimore County*, 281 Md. 548, 554, 383 A.2d 51, 55 (1977):

> While there is "[n]o principle ... better established, than that the granting or refusing of a writ of injunction, is a matter resting in the sound discretion of the court," ... it is also true that this discretion must be exercised by the chancellor upon a consideration of all the circumstances of the case.... It is frequently said that a proper exercise of discretion requires the court to consider four factors: likelihood of success on the merits; the "balance of convenience"; irreparable injury, which can include the necessity to maintain the status quo; and, where appropriate, the public interest.

The defendants' argument, that Lawrence was required to prove each of these factors, would seemingly have us analogize to the requirement that a plaintiff in a tort action

Section 3–202(a)(4) provides in substance that "a stockholder of a Maryland corporation has the right to demand and receive payment of the fair value of his stock if ... [t]he corporation amends its charter in a way which alters the contract rights, as expressly set forth in the charter, of any outstanding stock and substantially adversely affects the stockholder's rights, unless the right to do so is reserved by the charter of the corporation[.]"

prove each of the elements of the tort. In particular the defendants assert that there is no likelihood of success and no irreparable injury. They submit that Lawrence's effort to dissolve the Company and the ongoing acrimony and dissension between the two shareholders justify a minority freezeout whether Theodore's decision is measured by a business purpose or a fairness test, or both. Nor can there be irreparable injury, say the defendants, because Lawrence is assured payment of the fair value of his stock through statutory appraisal or, if it is ultimately judicially determined that Lawrence is entitled to his stock, because a court can effectively reverse the freezeout in this closely held corporation. The defendants argue that the trial judge based the preliminary injunction on an incorrect rule of law, by holding that the desire to eliminate internal dissension could not be a sufficient business reason to oust the minority. Defendants' ultimate point is that, as a matter of law, no business purpose is required so long as the transaction is "fair."

In contrast, the appellee, Lawrence, strives to place the trial court's decision principally on factual grounds and urges that there is no abuse of discretion. He sees the trial judge as unimpressed by predictions of corporate doom if Lawrence continues to be a stockholder and thus there is no business purpose or no fairness to the freezeout. Because the Company manages properties of which he and his immediate family are part owners, and because the April Suit is pending, Lawrence says there will be irreparable injury. Ultimately he urges that Maryland law is or should be that the majority cannot terminate the interest of the minority, without the latter's consent or without a corporate business purpose, simply by paying a fair price for the minority stock.

Certain portions of the trial court's opinion tend to support the defendants' position that the preliminary injunction was based largely on the premise that eliminating dissension cannot be a business purpose. In analyzing likelihood of success, the trial judge stated that "the bottom line is

that majority shareholders simply may not freeze out minority shareholders because of dissension, bitterness or acrimony between the shareholders, even in a closely held company as the Lerner Corporation." After observing that "[t]he right to continue as a shareholder in a corporation is a valuable personal right to the individual," the trial court said that "[a] shareholder, therefore, may not be ousted from the corporation because of strong differences between the individual shareholders as freely as the relationship might be severed if they were partners." In response to the defendants' argument that there could be no irreparable harm, the trial judge said that the argument

> totally ignores the fact that [Lawrence] would no longer be a shareholder, which is not necessarily dependent upon the monetary value of the shares but involves his personal right to remain a shareholder unless it would prevent the majority shareholders from carrying out a legitimate business transaction such as a beneficial merger.

The defendants in the case before us say the trial judge applied a per se rule against the freezeout of a minority stockholder in a closely held corporation. For a number of reasons we do not believe that the court ruled so extremely.

First, such a rule would decide the ultimate merits, on which the circuit court clearly reserved until trial on the merits.

Second, the trial judge described himself as persuaded that the "appropriate rational evaluation" was represented by *Clark v. Pattern Analysis & Recognition Corp.*, 87 Misc.2d 385, 384 N.Y.S.2d 660 (1976), a decision of the Supreme Court, Oneida County. That case did not apply any per se rule, but it did involve a preliminary injunction against a freezeout through a one to 4000 reverse stock split in a somewhat closely held corporation. The court said that a minority stockholder would be protected against threatened acts by the majority which violated fiduciary obligations, even if the corporation were to follow statutory mandates to the letter and that "[w]here there is an allega-

tion of fraud, illegality or bad faith, coupled with a tenuous showing of legitimate corporate business purpose, fairness requires that a minority shareholder be afforded an opportunity to fully contest the actions of the majority before he is deprived of his property." *Id.* at 390, 384 N.Y.S.2d at 664–65. The corporation in *Clark* claimed that its purposes in removing the plaintiffs as shareholders were to leave as shareholders only employees or close relatives of employees and to maintain the confidentiality of its financial statements.[2] The *Clark* court concluded that the majority had not made out a strong and compelling, legitimate business purpose supportive of the action taken against the minority who demonstrated a strong probability of ultimate success. *Clark* simply illustrates in the area of freezeouts one approach to whether a preliminary injunction should issue.

Third, the statutes give Theodore the power to freeze out Lawrence. The question to be decided on the merits in this case is whether equity will intervene permanently to enjoin the freezeout. In a case bearing some analogy to that issue this Court refused injunctive relief. *See Homer v. Crown Cork & Seal Co.*, 155 Md. 66, 141 A. 425 (1928). There the plaintiff owned 3.3% of the stock of A Co., the target company, in an early form of takeover. Of A Co.'s 9,500 outstanding shares the owners of B Co., one of A Co.'s competitors, had acquired 6,500 at an average price of $277 and had later acquired an additional 1,246 shares at higher prices. A Co. then proposed selling all of its assets to C Co., which was also controlled by A Co.'s majority. After the sale A Co. was to liquidate and would distribute $277 per share. C Co. alternatively offered to purchase the

2. Compare *Toner v. Baltimore Envelope Co.*, 304 Md. 256, 276, 498 A.2d 642, 652 (1985) where we gave an illustration of a proper business purpose. We hypothesized a corporation's buying its own shares from a former employee who was selling on a voluntary basis and who was employed by a competitor. We said that the desire to prevent the former manager from exercising an apparent right to inspect the corporation's books would justify the corporation's purchasing the former employee's stock while at the same time declining to purchase the stock of another shareholder.

shares of A Co.'s minority at $277 per share or to exchange C Co.'s stock for minority shares in A Co. Following the purchase B and C planned to consolidate. The complaint seeking to enjoin the sale of assets was dismissed on demurrer and affirmed on appeal.

This Court explained that if the allegations had set forth a proposal by a board of directors, and its certain adoption by the requisite vote of shareholders, that all the assets of one corporation be sold to another corporation at a price so greatly below the alleged value of these assets as to be indicative of a breach of duty to the selling corporation, the chancellor should not hesitate to intervene by injunction in order that the contemplated action be probed and prevented, if fraudulent, in view of the pregnant circumstance that the board of directors and the necessary majority of stockholders in each corporation were either identical or acting pursuant to a common scheme and in obedience to the same central control. The theory of the appellants is that a gross inadequacy of price is accompanied by collusion between two boards of directors, who represent but a single dominant will, in order that the assets of one corporation may become the property of the other at less than half its value through the approval of each corporation by the requisite majority vote of stockholders, who, in both corporations, are under the absolute control of the same dominant will or ownership. If this were the effect of all the allegations of the bill of complaint, the question would not be one of controversy between the majority and minority stockholders over value, in respect to which wide variance in opinion may honestly subsist, but would be one of fraud, which would be peculiarly the province of equity and so take the question out of the [appraisal] statute, since [the appraisal statute] contemplates proceedings begun and consummated in good faith and not those infected with fraud. [155 Md. at 79–80, 141 A. at 432.]

The particular complaint in *Homer* did not adequately plead "fraud" but revealed only a dispute over the value of the

minority stock which could have been fairly resolved in a statutory appraisal proceeding. *Homer* teaches that while an injunction can lie where there is "fraud," despite the availability of an appraisal remedy, an injunction will not issue simply because the majority use the letter of the corporation statutes to acquire the shares of the minority who are unwilling to sell and who claim the price is inadequate.

Fourth, the majority of courts that have considered challenges to freezeouts seem to agree, at least at the conceptual level of legal principle, that the majority may freeze out the minority if there is a business purpose for the action. In this context "business purpose" usually refers to the business of the corporation, viewed as an entity distinct from the majority. The difficulty at the level of application lies in the fact that corporations come in various sizes and that the facts of the decided cases, including the freezeout technique employed, come in various shapes. For cases allowing a freezeout after finding a business purpose see, *e.g., Dower v. Mosser Industries,* 648 F.2d 183 (3d Cir.1981) (to enable subsidiary corporation to obtain loan for expansion of business); *Grimes v. Donaldson, Lufkin and Jenrette, Inc.,* 392 F.Supp. 1393 (N.D.Fla.1974), *aff'd,* 521 F.2d 812 (5th Cir.1975) (to permit business dealings between related corporations which would otherwise be inhibited by potential claims of conflict of interest); *Tanzer v. International General Industries,* 379 A.2d 1121 (Del.1977) (to facilitate long term debt financing of the *parent* corporation where plaintiff was frozen out of subsidiary); *Teschner v. Chicago Title & Trust Co.,* 59 Ill.2d 452, 322 N.E.2d 54 (1974), *appeal dismissed,* 422 U.S. 1002, 95 S.Ct. 2623, 45 L.Ed.2d 666 (1975) (to reduce corporate expenses and simplify and facilitate procedures); *Alpert v. 28 Williams Street Corp.,* 63 N.Y.2d 557, 473 N.E.2d 19, 483 N.Y.S.2d 667 (1984) (to obtain additional capital for modernizing apartment house, an investment which tax shelter syndicate would not have made without freezing out minority of prior ownership); *Leader v. Hycor, Inc.,* 395 Mass. 215, 479

N.E.2d 173 (1985) (to "go private" where cost of maintaining public company was not justified by poor market in stock). On the other hand it is not a proper corporate business purpose for the majority stockholder to take the corporation private in order to have it assume the debt on personal loans to the majority stockholder. *See Coggins v. New England Patriots Football Club*, 397 Mass. 525, 492 N.E.2d 1112 (1986).

■ If the rule applied by the trial court here was that dissension between the owners of a business cannot, under any circumstances, justify a freezeout, then we do not agree. Discord within a closely held, general business corporation can conceivably reach the point where eliminating a dissonant minority's interest would not violate the majority's duty to the minority, particularly where matters of business judgment are the subject of controversy and the discord is impairing the corporation's ability to conduct business. *Horizon House-Microwave, Inc. v. Bazzy*, 21 Mass.App. 190, 486 N.E.2d 70 (1985) involved a corporation having three shareholders, two of whom were brothers, whose relationship was characterized by hostility and deadlock. One brother, who held the majority of stock, diluted the stockholdings of the other brother, in order to alleviate complaints about compensation by the third shareholder, a key employee in their highly technical enterprise. The court would not intervene in the corporate transactions by which those objectives were accomplished because they enabled the corporation to operate effectively in the best interest of all concerned.

To say that there is no per se rule against a minority freezeout in a closely held corporation does not, however, answer the issue before us. The issue here is whether the chancellor abused his discretion in preliminarily enjoining the freezeout, pending the ultimate decision on the merits. The answer to that question, in the context of the arguments advanced here, requires a brief review of the law relating to preliminary injunctions.

An excellent exposition is found in the leading case in the United States Court of Appeals for the Fourth Circuit on preliminary injunctions, *Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir.1977). On the merits the plaintiff claimed anti-trust violations, including retail price maintenance enforced by terminating the plaintiff as a dealer. In order to keep its business going while the suit for a permanent injunction was pending, the plaintiff sought a preliminary injunction which the trial court denied. It concluded, *inter alia*, that there was no likelihood of success because the dealer had failed to show that the manufacturer's actions were either collaborative or unilateral for purposes of the requirement under 15 U.S.C. § 1 that there be a contract, combination, or conspiracy. On the dealer's appeal from the denial of a preliminary injunction, the Fourth Circuit reversed. It reasoned as follows:

The correct trial court standard in this circuit ... is the balance-of-hardship test as ... formulated by the Eighth Circuit, *see, e.g., Love v. Atchison, T. & S.F. Ry. Co.*, 185 F. 321, 331–332 (1911):

"Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable, if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to the opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, *the injunction usually will be granted.*"

. . . .

The district court below erred in holding that plaintiff must first show "likelihood of success" in order to be entitled to preliminary relief. Instead, the first step in a Rule 65(a) situation is for the court to balance the "likelihood" of irreparable harm to the plaintiff against the "likelihood" of harm to the defendant; and if a decided imbalance of hardship should appear in plaintiff's favor,

then the likelihood-of-success test is displaced by Judge Jerome Frank's famous formulation:

> "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation."

*Hamilton Watch Co. v. Benrus Watch Co.,* [206 F.2d 738, 740, 743 (2d Cir.1953)]; *Semmes Motors, Inc. v. Ford Motor Co.,* 429 F.2d 1197, 1205 (2d Cir.1970). The importance of probability of success increases as the probability of irreparable injury diminishes, *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 923 (3d Cir.1974); *Canal Authority of State of Florida v. Callaway,* 489 F.2d 567, 576 (5th Cir.1974); *District 50, United Mine Workers v. United Mine Workers,* 134 U.S.App.D.C. 34, 412 F.2d 165, 168 (1969); *Packard Instrument Co. v. ANS, Inc.,* 416 F.2d 943 (2d Cir.1969); and where the latter may be characterized as simply "possible," the former can be decisive. Even so, it remains merely one "strong factor" to be weighed alongside both the likely harm to the defendant and the public interest. *Dino De Laurentiis Cinematografica, SpA. v. D–150, Inc.,* 366 F.2d 373, 375 (2d Cir.1966) (*quoting* 3 Barron & Holtzoff, Federal Practice & Procedure, § 1433 at 493 (1958)).

. . . .

Insofar as a trial court is concerned, the requirement of irreparable harm must also be evaluated within the basic context of the balance-of-hardship test.

Therefore, while "irreparability" may suggest some minimum of probable injury which is required to get the court's attention, the more important question is the *relative* quantum and quality of plaintiff's likely harm. The decision to grant preliminary relief cannot be intelligently made unless the trial court knows how much the precaution will cost the defendant. If it costs very little, the trial court should be more apt to decide that the

threatened injury is "irreparable" for the purposes of interlocutory relief. In addition, as we have noted above, even a "possible" irreparable injury has been held to suffice if there is strong probability of success on the merits. [550 F.2d at 194–96 (emphasis in original).]

And *see Telvest, Inc. v. Bradshaw*, 618 F.2d 1029 (4th Cir.1980); *Maryland Undercoating Co., Inc. v. Payne*, 603 F.2d 477 (4th Cir.1979); *Friendship Materials, Inc. v. Michigan Brick, Inc.*, 679 F.2d 100 (6th Cir.1982); *Chicago, B. & Q.R. Co. v. Chicago Great Western R. Co.*, 190 F.2d 361 (8th Cir.1951); *Benson Hotel Corp. v. Woods*, 168 F.2d 694 (8th Cir.1948); *Pratt v. Stout*, 85 F.2d 172 (8th Cir.1936); *Chesapeake and Potomac Telephone Co. v. Public Service Commission*, 560 F.Supp. 844 (D.Md.1983), *aff'd*, 748 F.2d 879 (4th Cir.1984), *cert. granted*, — U.S. —, 105 S.Ct. 3498, 87 L.Ed.2d 630 (1985); *Hess v. Hughes*, 500 F.Supp. 1054 (D.Md.1980).

In the case before us, Lawrence, absent the preliminary injunction, would have lost his right to 26.32% of the profits of the Company, at least beginning with its fiscal year June 1, 1985, to May 30, 1986.[3] On the basis of average profits for fiscal years 1980–84, this figure would be approximately $92,000. The continued payment of Lawrence's share of the profits, during the pendency of this suit, is not a burden to Theodore because he maintains that his objective is not to enlarge his share of the profits, but to protect the business of the Company from the harm he says Lawrence causes.

The defendants say that there is no harm to Lawrence because he gets the fair value of his stock and because he is not bound by the appraisal obtained by the Company. Under statutory appraisal, however, the fair value of stock is

---

**3.** Theodore's position is that he called the stockholders' meeting for May 28, 1985, because it was the earliest date legally and practically possible after the *Washington Post* article and not because he intended to cut Lawrence out of any share in the profits for the year ending May 30, 1985.

determined as of the close of business "on the day the stockholders voted on the transaction objected to." § 3–202(b)(1).[4] Absent a preliminary injunction, Theodore would have voted Lawrence out while Lawrence's derivative claim was pending in the April Suit. Thus, the valuation by way of statutory appraisal either could not be made, as an expert witness for Lawrence testified, or the appraisers would have to have attempted to evaluate the derivative claim and its effect on the value of the Company stock before the derivative claim was tried. That would surely be a most difficult and expensive task.

At this point the April and May Suits blend under the peculiar facts here. Indeed, the trial judge had considerable difficulty when hearing the application for a preliminary injunction in keeping counsel from trying the merits of the April Suit. The defendants recognized that Theodore was exposed to the accusation of having undertaken to cash out Lawrence in an effort to halt the derivative claim. To block any such accusation, defendants' counsel renounced in open court any attack on Lawrence's standing to continue the derivative claim if the freezeout were permitted to proceed. Further, to forestall any contention that consent could not make the derivative claim justiciable, defendants' counsel embraced the holding of *Zauber v. Murray Savings Association*, 591 S.W.2d 932 (Tex.Civ.App.1979) that equity will consider the involuntary destruction of a stockholder's status a nullity and allow that person to proceed with a derivative claim.[5] We shall assume that these concessions by the defendants mollify those effects of a freezeout which would be most damaging to Lawrence insofar as he is a minority shareholder plaintiff in a derivative claim. But the concessions do not alter the fact that, should the freezeout

---

**4.** For present purposes any difference in the date of valuation under § 2–214(a)(4), *see* n. 1, *supra,* and under § 3–202(b)(1) is immaterial.

**5.** We read *Zauber* as limiting its rule to situations in which the stockholder's interest was eliminated without a valid business purpose.

proceed and trigger a statutory appraisal, the appraisal process cannot realistically reflect the increase, if any, in the value of Lawrence's stock resulting from the merits, if any, of Lawrence's derivative claim. Also, those concessions assume that the April Suit will have to be tried whether or not the freezeout proceeds. Consequently, the trial court did not need to quantify the merits of the April Suit in order to conclude, in the scales of relative harm, that Lawrence is harmed by an immediate freezeout while Theodore and the other defendants are not harmed if Theodore is entitled to effect the freezeout but it is delayed.[6]

Lawrence additionally emphasizes that the Company manages properties which produce income for him and his immediate family. Had the freezeout proceeded and were it later to be set aside when the merits are decided, Lawrence would have been deprived of his statutory right under § 2–513 to inspect the books of the Company during that period. A consummated freezeout will mean that Lawrence, as a participant in real estate investing entities which have contracted with the Company for management services, will be locked into a relationship with the Company without the statutory right previously flowing from his shareholder status to inspect the books of the agent managing his investments.

The balance of comparative hardships could have gone the other way if Lawrence's conduct were, or were reasonably anticipated to be, harming the Company by its effect on key employees, including Theodore, or on customers, present or potential, or in some other way. Throughout the hearing, the trial judge pressed defense counsel to clarify how Lawrence's status *as a shareholder* had given rise to a business purpose for a minority freezeout when Lawrence had already been removed as a corporate director, officer, and employee. After hearing the defendants' evidence and

---

6. We deal only with the record before us. It is for the trial court to decide whether the April Suit should be tried before the May Suit or if they should be consolidated.

arguments, the circuit court concluded that "[i]t is difficult for this Court to see how Lawrence's continuation as a minority shareholder will cause any future disruption" in the Company. The trier of fact simply did not find any harm to the defendants in preliminarily enjoining the proposed exercise of majority power.

Our most recent decision dealing with a preliminary injunction is *Department of Transportation v. Armacost*, 299 Md. 392, 474 A.2d 191 (1984) where we reversed the grant of interlocutory relief. Contrary to the instant case in which the legal issues are substantial and the facts and inferences therefrom are disputed, the proponents of the injunction in *Armacost*, in order to prevail on their principal contentions, would have to have demonstrated that there was no rational basis for the legislative and administrative decision to include Carroll County within the region in which a motor vehicle emissions inspection program would be implemented as a clean air strategy. Because there was virtually no likelihood of success we were able to base the decision entirely on that factor.

In *Rowe v. Chesapeake and Potomac Telephone Co.*, 56 Md.App. 23, 466 A.2d 538 (1983), the Court of Special Appeals gave considerable weight to the balance of convenience. The telephone company sought a declaratory judgment that an amendment to the Montgomery County Charter was unconstitutional and obtained a preliminary injunction against implementation of the provision. Taxpayers who had intervened sought dissolution of the injunction on appeal. The court affirmed because the balance of convenience, as well as the public interest and injury to the telephone company, supported interlocutory relief. With respect to likelihood of success the court observed that the legal issue presented, whether the charter amendment conflicted with public general laws relating to Public Service Commission duties, was a substantial one on which decision should be deferred until after hearing on the merits.

The defendants in the case *sub judice* stress the undeniable fact that Count IX of the April Suit asks for appoint-

ment of a receiver for, and dissolution of, the Company. They say that because Lawrence would destroy the Company he cannot be harmed if he is separated from it for fair value. Count IX of the April Suit asks for dissolution as a remedy for waste by management. It is legally possible to have a receiver appointed to supervise a corporate dissolution on the complaint of a shareholder if the "acts of the directors or those in control of the corporation are illegal, oppressive, or fraudulent." § 3–413. For cases recognizing the potentiality of the remedy, but in which the facts did not support its application, see *Murray-Baumgartner Surgical Instrument Co. v. Requardt*, 180 Md. 245, 23 A.2d 697 (1942); *James F. Powers Foundry Co. v. Miller*, 166 Md. 590, 171 A. 842 (1934); *Howeth v. Coulbourne Bros.*, 115 Md. 107, 80 A. 916 (1911); *Callaway v. Powhatan Improvement Co.*, 95 Md. 177, 52 A. 916 (1902). We said in *Davis v. United States Electric Power & Light Co.*, 77 Md. 35, 40, 25 A. 982, 984 (1893) that "[t]he power is a discretionary one, to be exercised with great circumspection, and only in cases where there is fraud or spoliation, or imminent danger of the loss of the property, if the immediate possession should not be taken by the court. . . ." Count IX of the April Suit is merely the extension of Count I's derivative claim and asks for a very extreme remedy for alleged mismanagement. As explained by the Supreme Court of West Virginia in *Masinter v. WEBCO Co.*, 262 S.E.2d 433, 439 (W.Va.1980),

> most courts have concluded that because of the drastic consequences of dissolution, less drastic alternatives should be fashioned if possible. A leading commentator on corporate law, advocating this approach, has stated:
>
> > "Winding-up a corporation is so drastic a remedy that it is not ordered if the wrong may be adequately repaired by milder relief. Unless the wrongs are being conducted systematically or continuously, it may be possible to redress past derelictions by ordering an accounting, or by the setting aside and cancellation of wrongful acts, or to prevent future wrongs by injunction or mandamus, or to effect relief by some combina-

tion of these and other remedies." (Hornstein, *A Remedy for Corporate Abuse—Judicial Power to Wind Up a Corporation at the Suit of a Minority Stockholder,* 40 Col.L.Rev. 220, 236 (1940)). [Footnote omitted.]

Lawrence's assertion of Count IX does not make the grant of a preliminary injunction an abuse of discretion any more than did Lawrence's assertion of the derivative claim in Count I.

Having been unsuccessful to date in showing the circuit court why there was a corporate business purpose in freezing Lawrence out, the defendants alternatively argue that no business purpose is required. Rather, they assert that the majority may cash out the minority for any reason so long as the transaction is fair. In this respect defendants ask us to apply in the present posture of this case the rule in *Weinberger v. UOP, Inc.,* 457 A.2d 701 (Del.1983) in which the Delaware Supreme Court abandoned any business purpose requirement and announced that chancery would review a cash out merger only under the standard of complete fairness. If the transaction is fair, the complainant is left to the Delaware appraisal remedy which was judicially expanded in the *Weinberger* case.

*Weinberger* dealt with publicly traded companies. The cash out was effected by the merger of a subsidiary into a parent corporation. As part of its rationale the Delaware court explained that in the context of that case its fairness rule looked to adequacy of price and to fairness in all of the circumstances of the dealing which resulted in the transaction.

We will not decide on this appeal from the grant of a preliminary injunction whether to adopt the *Weinberger* rule. In the context of this case we conclude simply that Lawrence " 'has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them fair ground for litigation and thus for more deliberate investigation.' " *Blackwelder, supra,* 550 F.2d at 195. In addition to whether a business purpose should be required

and whether *Weinberger* should apply in closely held corporations, questions presented in this particular case include whether fairness would embrace more than a fair price and whether, because Lawrence is no longer an officer, director, or employee, his relationship to the Company is principally that of an investor.[7]

The factor of irreparable injury "can include the necessity to maintain the status quo[.]" *State Department of Health and Mental Hygiene, supra,* 281 Md. at 554, 383 A.2d at 55. There we cited and quoted from 43 C.J.S. *Injunctions* § 17, at 427 for the proposition that a "court will grant preliminary injunction when one of the parties is committing an act 'that will cause irreparable injury *or* destroy the status quo of the controversy before a full hearing can be had....'" 281 Md. at 559, 383 A.2d at 57–58 (emphasis in original). Here the merits of the May Suit concern Lawrence's alleged right to be and remain a shareholder in the Company. The freezeout, if allowed to proceed, will destroy that status. That is an irreparable injury in the context of preliminary injunctions. The defendants nevertheless propose that the status can be recreated. This would involve ordering Theodore to cause the

---

7. Lest the reader have any lingering doubt whether the questions raised are serious, substantial, difficult and doubtful, we append the following partial reading list: Berger and Allingham, *A New Light on Cash-Out Mergers: Weinberger Eclipses Singer,* 39 Bus.Law. 1 (1983); Herzel and Colling, *Establishing Procedural Fairness in Squeeze-Out Mergers After Weinberger v. UOP,* 39 Bus.Law. 1525 (1984); Note, *Delaware Improves Its Treatment of Freezeout Mergers: Weinberger v. UOP, Inc.,* 25 B.C.L.Rev. 685 (1984); Lawson, *Reverse Stock Splits: The Fiduciary's Obligations Under State Law,* 63 Calif.L.Rev. 1226 (1975); Dykstra, *The Reverse Stock Split—That Other Means of Going Private,* 53 Ch.-Kent L.Rev. 1 (1976); Vorenberg, *Exclusiveness of the Dissenting Stockholder's Appraisal Right,* 77 Harv.L.Rev. 1189 (1964); Note, *Freezing Out Minority Shareholders,* 74 Harv.L.Rev. 1630 (1961); Kutcher, *Freezeouts of Minority Shareholders in Closely-Held Corporations,* 25 La.B.J. 123 (1977); Note, *Corporate Freeze-Outs Effected By Merger: The Search for a Rule,* 37 U.Pitt.L.Rev. 115 (1975); Steinberg and Lindahl, *The New Law of Squeeze-Out Mergers,* 62 Wash.U.L.Q. 351 (1984); Thompson, *Squeeze-Out Mergers and the "New" Appraisal Remedy,* 62 Wash.U.L.Q. 415 (1984); Brudney and Chirelstein, *A Restatement of Corporate Freezeouts,* 87 Yale L.J. 1354 (1978).

Company's authorized capital to be increased, issuing new stock to Lawrence, an accounting of profits as the Company had recorded them, and, if the derivative claim produces a recovery, a further accounting as that recovery passes through the Subchapter S corporation. If Theodore's view of lack of irreparable harm were to prevail, there could be issues of whether Lawrence needs to post security for possible repayment of the statutory appraisal value and, further, if the freezeout were then to be enjoined on the merits, there could be issues of how the fair value payment, which in part at least would have represented earnings potential of the Company, is to be credited against any balance due Lawrence on the accounting for interim profits. All of these complications would be solely for the purpose of returning to the *status quo ante litem* if a consummated freezeout were enjoined when the merits are decided. The complications can be avoided simply by maintaining the status quo until the merits are decided.

A " 'flexible interplay' among all the factors considered" supports the preliminary injunction. *Blackwelder,* 550 F.2d at 196.

JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY AFFIRMED. COSTS TO BE PAID BY THE APPELLANTS.