OPINION
Defendants-appellants, Wellsville Foundry, Inc. (Wellsville Foundry) and Charles H. Gilmore (Gilmore), appeal a decision rendered by the Columbiana County Court of Common Pleas whereby the trial court issued an injunction enjoining the "reverse stock split" initiated by appellants. The trial court's injunction effectively restored plaintiffs-appellees, Gerald and Lois Kelley, to their full rights as shareholders in Wellsville Foundry.
Wellsville Foundry is in the business of selling castings to the steel industry. Appellees were original shareholders in Wellsville Foundry since its inception in 1967. In addition to owning a minority interest in Wellsville Foundry, appellees also own 100 percent of the stock in Yellow Creek Castings, Inc. (Yellow Creek), which is a competitor of Wellsville Foundry. Yellow Creek sells similar products to the steel and pottery industry.
Both Wellsville Foundry and Yellow Creek compete for similar customers and sell similar products throughout the country. The Yellow Creek Foundry and Wellsville Foundry are located side-by-side in a rural area.
In 1986 Gilmore purchased four hundred shares, or 80 percent, of the total stock in Wellsville Foundry. At the time Gilmore purchased these shares, he testified that he was "vaguely aware" that appellees owned a competitive foundry. Since Gilmore's purchase in 1986, appellees have not been involved in the daily operation of Wellsville Foundry, nor have they ever requested any information from Wellsville Foundry that they are entitled to in their capacity as shareholders. Appellees have never received any proprietary information or trade secrets from Wellsville Foundry, including customer lists or pricing information. As shareholders, appellees have received financial statements of the corporation and notice of various shareholder meetings.
The parties are the sole shareholders in Wellsville Foundry. Gilmore has been the president, treasurer and director of Wellsville Foundry, and as the majority shareholder appoints the Board of Directors. He receives a salary and the same benefits as other employees. Gilmore received a $30,000.00 loan from Wellsville Foundry in the late 1980's and has yet to make any interest payments on the loan.
In 1987, appellees' minority interest represented a 20 percent interest in the company.
In 1987, Gilmore requested that the Board of Directors authorize the issuance of two thousand shares of no par stock for sale to Gilmore at the price of $.50 per share. A shareholders' meeting was held on April 10, 1987, at which time appellee Gerald Kelly was present, with the proxy of appellee Lois Kelly. At the meeting, the Board of Directors caused the issuance of an additional two thousand shares of common stock to Gilmore for the sum of $1,000.00. Appellees cast the sole dissenting votes.
Appellees were never given the opportunity to purchase this stock, nor were appellees ever notified that the stock was being sold at the price of $.50 a share. Gilmore testified that this was an attempt by the corporation to dilute appellees' interest in the corporation. The issuance of stock had the effect of diluting appellees' minority interest from a 20 percent interest of ownership to a roughly 4 percent interest of ownership. Appellees took no legal action concerning the issuance of these additional shares and their purchase by Gilmore.
In August of 1997, Gilmore caused the reverse stock split to be placed into action, which gave rise to this lawsuit. The resolution, approved by all the shareholders except appellees, reduced the number of authorized shares and left appellees with fractional shares. The resolution also valued the fractional shares at $3,750.00, per 1/11 share, and set up a procedure for the purchase of these shares by the corporation. The resolution provided dissenting shareholders with a right to contest the valuation of the fractional shares, the ultimate valuation of which would be decided by compulsory arbitration.
In arriving at a valuation to suggest to the Board of Directors and the shareholders, Gilmore initially consulted with the CPA firm that reviews the company's books. Gilmore learned that the cost of a CPA appraisal would run almost as much as the value of the minority interest under his proposed plan. After reading a magazine article on business valuations, Gilmore made his own calculations as to the value of the 1/11 share of stock. Gilmore's CPA approved the procedure, but not the valuation.
Under the valuation procedure adopted by Gilmore, appellees were given a maximum of ten days after the passing of the resolution to determine whether to avail themselves of this arbitration procedure or accept the price offered by the corporation. Gilmore admits that little, if any, financial information was afforded to appellees prior to the August 27, 1997 shareholders meeting, or prior to the lapse of the ten-day period, on which they could determine how to value the stock.
Rather than follow the procedures set forth in the resolution and proceed to arbitration as to the value of their minority stock interest, appellees initiated this lawsuit to halt the reverse stock split, contest the valuation procedures, and allege other stockholder actions against Gilmore and Wellsville Foundry.
Gilmore testified that the corporation is on the verge of developing new products. Gilmore feels that Wellsville Foundry has "turned the corner" in its business. Gilmore also testified that he sought legal advice, and was under the belief that appellees, as shareholders, were entitled to certain proprietary information under R.C. 1701.37 that they could use to compete against Wellsville Foundry. Therefore, Gilmore testified that he felt it necessary to try to eliminate appellees' interest because they are in competition with the company.
There was no evidence before the trial court that indicated that the two corporations have "done battle" in the market place. While they may share similar products and similar customers in the market place, both seem to be established in their own particular nitch, vis-^E-vis each other and the other competitors in the market.
Appellees filed a two-count complaint in the Columbiana County Court of Common Pleas on September 9, 1997. In Count 1 of the complaint, appellees sought a temporary restraining order and permanent injunction enjoining Wellsville Foundry from taking any action to alter or amend the stock of the corporation and to lessen or eliminate appellees' stock interest. Appellees sought compensatory and punitive damages in Count 2.
In an order dated September 12, 1997, the trial court granted appellees' temporary restraining order. The trial court held:
 "Defendants are hereby restrained until further order of this Court from taking any action which would prejudice such rights, if any, as Plaintiffs may ultimately be determined to have as shareholders of Defendant, The Wellsville Foundry, Inc., * * *."
On January 8th and 9th, 1998 respectively, appellants and appellees filed cross motions for partial summary judgment as to Count 1 of the complaint seeking permanent injunctive relief. The trial court denied the parties' motions for summary judgment and set the matter for trial.
A trial was held on the issue of a permanent injunction on September 9th and 10th, 1998. The trial court entered judgment in favor of appellees on October 6, 1998, enjoining the reverse stock split and restoring appellees to their full rights as shareholders in Wellsville Foundry.
On April 26, 1999, the parties entered into a stipulation and settlement agreement dismissing Count 2 of appellees' complaint with prejudice.
Appellants then filed this timely notice of appeal on May 19, 1999.
Appellants' first assignment of error states:
 "THE TRIAL COURT ERRED IN REFUSING TO GRANT APPELLANTS SUMMARY JUDGMENT AS THE LEGALITY OR VALIDITY OF A REVERSE STOCK SPLIT DOES NOT DEPEND ON WHETHER OR NOT THE TRANSACTION IS MOTIVATED BY A `BUSINESS PURPOSE' UNRELATED TO THE ELIMINATION OF MINORITY SHAREHOLDERS."
Although appellants contend that the trial court erred in denying their motion for summary judgment, appellants essentially argue that the trial court erred as a matter of law in applying a business purpose test at trial in determining the legality of a reverse stock split.
Appellants urge that the trial court erroneously failed to adopt the test set forth by the Delaware Supreme Court in Weinberger v. UOP, Inc.
(Del. 1983), 457 A.2d 701. Appellants argue that the test used in determining the validity of a reverse stock split should be one solely of fairness. Appellants further note that the Delaware Supreme Court, widely known for its expertise in the area of business law, abandoned the business purpose test in favor of a "fairness test." Appellants argue that the fairness test provides the necessary protection due to minority shareholders.
As noted by the parties and the trial court, the issue before this court appears to be one of first impression in Ohio. The question presented by the parties on appeal concerns a question of law as to the imposition of the proper test in determining the validity of a reverse stock split under Ohio law. Appellate courts apply a de novo standard of review to questions of law. In re White (1998), 128 Ohio App.3d 387,390.
A reverse stock split is one in which shareholders of a corporation receive one new share of stock for each "block" of old stock they turn in. For example, a shareholder may receive one share of stock for every 10, 100, or 1,000 shares of old stock they turn in. If a shareholder owns less than the number of old shares required to be converted into a new share, the shareholder generally receives cash rather than a fractional share in the new company.
R.C. 1701.69(B) permits the shareholders of a corporation, through a shareholder's vote, to reduce the outstanding shares in the corporation by amending its articles of incorporation to change the number of authorized shares.
R.C. 1701.24(C)(1) provides that a corporation may issue fractional shares, or may pay, in lieu of issuing a certificate for a fractional share, an amount of cash specified as the value of that fractional share in the articles, resolution of directors, or other agreement or instrument, pursuant to which such fraction of a share would otherwise be issued.
Applying the law to the facts of the present case, the language under R.C. 1701 authorized appellants' actions in undertaking the reverse stock split. First, R.C. 1701.69 authorized appellants' actions amending the articles of incorporation to reduce the number of authorized shares in the August 1997 meeting. Second, the corporation had the ability to eliminate fractional shares and purchase them from minority shareholders according to their issue value pursuant to R.C. 1701.24. Therefore, as a general matter, the reverse stock split is authorized under Ohio statutory law.
Next, the issue is what legal standard to apply in determining the validity of a reverse stock split. Delaware courts are widely renowned and respected for their expertise in the area of business law. However, the starting point for the analysis as to the proper legal test to apply in a reverse stock split is the Ohio Supreme Court's decision in Crosbyv. Beam (1989), 47 Ohio St.3d 105.
In Crosby, the plaintiffs, minority shareholders in a closely held corporation, brought a claim for breach of fiduciary duty against defendants-majority shareholders. The Ohio Supreme Court examined the dilemma of the minority shareholder in a closely held corporation and noted:
 "While a close corporation provides the same benefits as do other corporations, such as limited liability and perpetuity, the closed corporation structure also gives majority or controlling shareholders opportunities to oppress minority shareholders. For example, the majority or controlling shareholders may refuse to declare dividends, may grant majority shareholders-officers exorbitant salaries and bonuses, or pay high rent for property leased from majority shareholders." (Emphasis added.) Id. at 108. citing Donahue v. Rodd Electrotype Co. of New England, Inc. (1975), 367 Mass. 578, 588-89, 328 N.E.2d 505, 513.
Further discussion by the court demonstrated its concern over unjust oppression of a minority shareholder in a closed corporation. The court stated:
 "Minority shareholders in a close corporation, denied any share of the profits by the majority shareholder's action will either suffer a loss or try to find a buyer for their stock. This situation is contrasted with an oppressed minority shareholder in a largely publicly owned corporation who can more easily sell his shares in such a corporation. Generally there is no ready or available market for the stock of a minority shareholder in a close corporation. This presents a plight for a minority shareholder in a close corporation who can become trapped in a disadvantageous situation from which he cannot be easily extricated." (Emphasis added.) Id., citing Donahue, 367 Mass. at 591-92, 328 N.E.2d at 515.
Responding to the plight of the minority shareholder in a closely held corporation, the court laid down a number of guidelines concerning the fiduciary relationship between majority and minority stockholders in a closely held corporation. First, majority shareholders generally have a fiduciary duty to minority shareholders in a closely held corporation.Id. at 108. Second, this fiduciary duty is a heightened one, "similar to the duty that partners owe one another in a partnership because of the fundamental resemblance between the close corporation and a partnership."Id. at 109.
The court went on to list examples constituting a majority shareholder's breach of fiduciary duty to a minority shareholder:
 "Majority or controlling shareholders breach such fiduciary duty to minority shareholders when control of the close corporation is utilized to prevent the minority from having an equal opportunity in the corporation. Donahue, supra, 367 Mass. at 598, 328 N.E.2d at 518, and Tillis v. United Parts, Inc.
(Fla.App. 1981), 365 So.2d 618. * * *
"* * *
 "Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage, without providing minority shareholders with an equal opportunity to benefit, such breach, absent a legitimate business purpose, is actionable. * * *" (Emphasis added.) Id.
As the foregoing passage indicates, the Ohio Supreme Court intended to adopt a business purpose rule in evaluating a majority shareholder's breach of his fiduciary duty to the minority shareholder. Adopting a business purpose rule with regards to reverse stock splits also addresses two fundamental concerns raised in Crosby. First, adopting a business purpose rule protects the minority shareholder from unfair or oppressive actions taken by the majority shareholder. Second, the business purpose rule does not unduly constrain the corporation or majority shareholder's ability to undertake those transactions that may have the underlying effect of discriminating against the minority shareholder, but are still nonetheless justifiable as legitimate business actions necessary to ensure the success of the corporation.
Imposition of the business purpose rule is necessary to protect the interests of the minority shareholder. Adopting a fairness test would permit a majority shareholder in a close corporation to eliminate a minority shareholder based on nothing more than a whim as long as the corporation complied with the statutory formalities and offered the minority shareholder a fair value for their stock.
As appellees point out, the rule sought by appellants would permit:
 "A majority shareholder of a closed corporation at any time to eliminate the minority shareholders so that the majority may reap solely for themselves any benefit from investment in the corporation. As such, the minority shareholder in Ohio would be relegated to the position that although he has patiently waited for years with his investment at risk, once the economic enrichment have come in, he will be waiting at the empty dock while the majority shareholder sails on to the economic prosperity with impunity as to the rights of the minority shareholder." (Appellees' Brief, pgs. 14-15.)
This would constitute a fiduciary violation by the majority shareholder under Crosby:
 "Where majority or controlling shareholders in a close corporation breach their heightened fiduciary duty to minority shareholders by utilizing their majority control of the corporation to their own advantage without providing minority shareholders with an equal opportunity to benefit, such breach absent a legitimate business purpose, is actionable." (Emphasis added.) Crosby, 47 Ohio St. at 109.
Imposition of the business purpose rule to reverse stock splits protects the interests of the minority shareholder without unduly restricting the majority shareholder's ability to make decisions in the best interest of the company.
For the aforementioned reasons, appellants' first assignment of error is without merit.
Appellants' second assignment of error states:
 "THE TRIAL COURT RULED AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN HOLDING THAT THE ELIMINATION OF A MINORITY SHAREHOLDER WHO DIRECTLY COMPETES WITH THE CORPORATION AND WHO HAS ACCESS TO PRIVATE CORPORATE INFORMATION IS NOT A LEGITIMATE BUSINESS PURPOSE FOR CONDUCTING A REVERSE STOCK SPLIT."
In their second assignment of error, appellants allege the trial court ruled against the manifest weight of the evidence by ruling that appellants failed to demonstrate a legitimate business purpose to justify the reverse stock split that eliminated appellees' interest in the company.
Appellants set forth two arguments in hopes of satisfying the business purpose test. First, appellants contend that they have a legitimate business purpose in eliminating appellees' minority interest because appellees own an adjoining foundry that is directly engaged in competition with appellants. Second, appellants also argue that they have a legitimate business purpose in eliminating appellees' minority interest based upon appellees' right of open access under R.C. 1701.37 to financial books, customer lists, pricing information, and other information which appellees could use in their foundry business to gain a superior advantage over Wellsville Foundry. Appellants' rely on Lernerv. Lerner (Md. 1986), 511 A.2d 501, for the proposition that sufficient shareholder strife within a closely held corporation constitutes a legitimate business purpose for conducting a reverse stock split and freezing-out minority shareholders.
On review, an appellate court must not substitute its judgment for that of the trial court where some competent and credible evidence exists supporting the finding of fact and conclusions of law rendered by the trial court. Myers v. Garson (1993), 66 Ohio St.3d 610. In considering the issue of whether a trial court's decision is against the manifest weight of the evidence, the Ohio Supreme Court has noted:
 "While we agree with the proposition that in some instances an appellate court is duty bound to exercise the limited prerogative of reversing a judgment as being against the manifest weight of the evidence in a proper case, it is also important that in doing so a court of appeals be guided by a presumption that the findings of the trier-of-fact were indeed correct.
 "The underlying rationale of giving deference to the findings of the trial court rests with the knowledge that the trial judge is best able to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony * * *." State ex rel Pizza v. Strope (1990), 54 Ohio St.3d 41, 46 quoting Seasons Coal Co. v. Cleveland (1984), 10 Ohio St.3d 77.
A judgment supported by some competent and credible evidence going to all the essential elements of the case will not be reversed by an appellate court as being against the manifest weight of the evidence.Seasons Coal Co., 10 Ohio St.3d at 80.
The trial court ruled that appellants failed to demonstrate a legitimate business purpose in eliminating the minority shareholders. A thorough review of the record shows that the judgment of the trial court was not against the manifest weight of the evidence.
R.C. 1701.37 provides in relevant part:
 "(C) Any shareholder of the corporation, upon written demand stating the specific purpose thereof, shall have the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose * * * its books and records of account, minutes, and records of shareholders aforesaid * * *." (Emphasis added.)
A shareholder may exercise his or her right of inspection so long as the shareholder acts in good faith for the protection of the interests of the corporation and his own interests. Lake v. Buckeye Steel Casting Co.
(1965), 2 Ohio St.2d 101, 104. However, "[i]t does not follow that he canmake an unlawful use of that information * * *." (Emphasis added.) Id.
The burden of proving unreasonable or improper purpose lies upon the corporation. Mayer v. Cincinnati Economy Drug Co. (1951), 89 Ohio App. 512,518. The fact that the demanding shareholder is also a shareholder in a competing corporation is not by itself, sufficient evidence of an unreasonable or improper purpose. Id. at paragraph five of the syllabus.
An examination of both the law and the facts in the present case demonstrates that appellants failed to demonstrate a proper business purpose in eliminating the interest of the minority shareholders. As noted in Mayer, the mere fact that appellees are shareholders in a competing corporation is an insufficient reason to justify denying a shareholder access to corporate books, let alone eliminating their interest in the corporation altogether. Appellees have never received or asked to receive a customer list, pricing information, access to trade secrets, nor any other information of a propriety nature to Wellsville Foundry.
Even if appellees were to demand such information, appellants have access to sufficient procedural safeguards to prevent appellees from gaining access to this information for improper purposes. R.C. 1701.37
permits appellees to access information regarding a corporation's books and records, but only for reasonable and proper purposes. As such, R.C.1701.37 also prohibits appellees from gaining access to the books, financials, where the reasons are improper and would be inimical or detrimental to the accomplishment of the purpose for which the corporation was organized. Lake, 2 Ohio St. at 105.
Appellants' reliance on Lerner v. Lerner (Md. 1986), 511 A.2d 501, is also misplaced. In Lerner, the Maryland Supreme Court noted:
 "Discord within a closely held, general business can conceivably reach the point where eliminating a dissonant's minority interest would not violate the majority's duty to the minority particularly where matters of business judgment are the subject of the controversy and the discord is impairing the corporation's ability to conduct business." (Emphasis added.) Id. at 507.
The aforementioned passage shows that the court was reluctant to find a business purpose for eliminating the minority shareholder, and would only do so where the corporation could show an impairment of its ability to do business resulting from the discord of the minority shareholder. In rejecting the corporations' assertion of business purpose, the court noted:
 "Throughout the trial, the judge pressed defense counsel to clarify how Lawrence's status as a shareholder had given rise to a business purpose for a minority freezeout when Lawrence had already been removed as a corporate director, officer, and employee. After hearing the defendant's evidence and arguments, the circuit court concluded that `[i]t is difficult for this Court to see how Lawrence's continuation as a minority shareholder will cause any future disruption' in the Company." (Emphasis added.) Id. at 509-510.
Having recognized that the corporation failed to show that minority shareholder's status as a shareholder impaired or disrupted the company's ability to conduct business, the court refused to find a valid business purpose for freezing-out the minority shareholder.
Much like the case presented in Lerner, appellants here have failed to show a business purpose for eliminating appellees' minority interest. Appellees' status as minority shareholders in no way impaired or disrupted the corporation's ability to function or conduct business.
For the aforementioned reasons, appellants' second assignment of error is without merit.
Appellants' third assignment of error states:
 "THE TRIAL COURT ERRED AS A MATTER OF LAW BY USING A DE NOVO STANDARD TO REVIEW THE ACTIONS OF THE WELLSVILLE FOUNDRY BOARD OF DIRECTORS WHEN THE ACTION OF THESE DIRECTORS WERE ENTITLED TO A PRESUMPTION OF VALIDITY."
In their third assignment of error, appellants allege that the trial court erred as a matter of law by reviewing the actions of Wellsville Foundry's directors de novo. Appellants allege that they are entitled to the protection of the business judgment rule and that therefore the actions taken by their directors, including those taken in furtherance of the reverse stock split, are entitled to a presumption of validity. Appellants argue that the trial court erred as a matter of law by substituting its judgment for the judgment of the corporation's Board of Directors.
In Ohio, as well as every other state, "the long established principle is that the directors of a corporation have an obligation to the corporation which is in the nature of that of a fiduciary." Radol v.Thomas (C.A. 6, 1985), 772 F.2d 244, 256. A director's obligation to the corporation and shareholders includes two separate and distinct duties: the duty of loyalty and the duty of care. Id. Moreover, Ohio has codified these principles. R.C. 1701.59(B) provides in relevant part:
 "A director shall perform his duties as a director * * * in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with the care that an ordinarily prudent person in a like position would use under similar circumstances * * *." (Emphasis added.)
In evaluating a director's compliance with the duty of care, Ohio courts must adhere to the business judgment rule, which states that a court shall not inquire into the wisdom of actions taken by directors in the absence of fraud, bad faith, or abuse of discretion. Radol,772 F.2d at 256. However, a party cannot claim protection of the business judgment rule when they have failed to comply with the second requirement of the rule, and have breached the duty of loyalty. MacAndrew Forbes v.Revelon Inc. (Del.Ch.an. 1985), 501 A.2d 1239, 1250.
Applying the law to the facts of the present case, the trial court did not err by failing to extend protection of the business judgment rule to the appellants for their actions taken in connection with the reverse stock split. Appellants have failed to satisfy the two prongs of the business judgment rule set forth in R.C. 1701.59. First and foremost, the appellants have failed to demonstrate that they have satisfied the requisite duty of loyalty. A review of the record shows that Gilmore, as majority shareholder and director, undertook the reverse stock split with the sole purpose of eliminating the minority shareholders' interest. Gilmore, in his position as both director and majority shareholder, used control of the close corporation to prevent appellees from having an equal opportunity in the corporation. In addition to these actions constituting a breach of majority shareholder's fiduciary duty to a minority shareholder, it is also clear that Gilmore's actions were primarily centered on his personal benefit rather than that of the corporation. As such, Gilmore's actions violated the duty of loyalty.
For the aforementioned reasons, appellants' third assignment of error is without merit.
Appellants' fourth assignment of error states:
 "THE TRIAL COURT ERRED AS A MATTER OF LAW IN RULING THAT THE PROCEDURE FOR CONTESTING THE REVERSE STOCK SPLIT VALUATION DID NOT ADEQUATELY PROTECT THE MINORITY SHAREHOLDER."
Pursuant to App.R. (12)(A)(1)(c), appellants' fourth assignment of error has been rendered moot by the disposition of appellants' previous three assignments of error.
Having found that appellants' actions in undertaking the reverse stock split were contrary to law, the issue as to the validity of the dissenting shareholder procedures adopted by Gilmore in calculating the value of the minority shareholders' stock is rendered moot.
Appellants' fifth and final assignment of error states:
 "THE TRIAL COURT ERRED IN GRANTING APPELLEES AN INJUNCTION OF THE REVERSE STOCK SPLIT SINCE THE REVERSE STOCK SPLIT HAD ALREADY OCCURRED."
In their fifth assignment of error appellants contend that the trial court erred in enjoining the reverse stock split since the reverse stock split had already taken effect prior to appellees' filing of this action, thus rendering this action moot. Appellants contend that the reverse stock split became final no later than September 8, 1997, in accordance with the terms and the resolution adopted August 27, 1997. Appellants argue that a court may not enjoin past acts that have already taken place. Instead of seeking a permanent injunction, appellants contend that appellees should have sought to rescind or cancel the reverse stock split, not enjoin it.
While the language of the August 27, 1997 resolution seems to contemplate that the reverse stock split was to take effect ten days after adoption, there is also evidence to the contrary that the reverse stock split had not yet been completed prior to the trial court's issuance of the restraining order on September 12, 1997, enjoining further action of the reverse stock split.
The actions taken by appellants were inconsistent with the notion that the reverse stock split had taken effect prior to the trial court's issuance of the temporary restraining order. On October 17, 1997, Gilmore sent a letter to appellees indicating that the reverse stock split had not yet been completed. In the correspondence, Gilmore again tried to solicit appellees' minority shares to complete the reverse stock split. Gilmore stated, "I do not believe our disagreement over that issue should be an obstacle to completing the reverse stock split adopted by theshareholders." (Emphasis added.) Thus, Gilmore's own words were proof that the reverse stock split had not been completed, and as such the trial court had the equitable power to enjoin it.
For the reasons stated herein, appellants' fifth assignment of error is without merit.
Accordingly, the judgment of the trial court is hereby affirmed.
Cox, J., concurs, Vukovich, J., concurs.