### In re J.P. STEVENS & CO., INC. SHAREHOLDERS LITIGATION.

**WEST POINT–PEPPERELL, INC., a Georgia corporation, and STN Holdings, Inc., a Delaware corporation, Plaintiffs,**

**v.**

**J.P. STEVENS & CO., INC., a Delaware corporation, Ward Burns, E. Virgil Conway, Marvin B. Crow, James B. Edwards, Buck Mickel, Henry Ponder, Whitney Stevens, David M. Tracy, John J. Zerrenner, Odyssey Partners, a New York partnership, JPS Acquisition Corp., a Delaware corporation and JPS Holding Corp., a Delaware corporation, Defendants.**

Civ. A. Nos. 9634, 9763.

Court of Chancery of Delaware, New Castle County.

Submitted: April 6, 1988.
Decided: April 8, 1988.

Jack B. Blumenfeld, and Michael Houghton, of Morris, Nichols, Arsht & Tunnell, Wilmington, and Paul Vizcarrondo, and Barbara Robbins, of Wachtell, Lipton, Rosen & Katz, New York City, for plaintiffs West Point–Pepperell and STN Holdings.

Joseph A. Rosenthal, and Carolyn D. Mack, of Morris, Rosenthal, Monhait & Gross, P.A., Wilmington, and Arthur N. Abbey, and Judith L. Spanier, of Abbey & Ellis, New York City, and Pamela S. Tikellis, of Greenfield & Chimicles, Wilmington, for Shareholder plaintiffs.

Rodman Ward, Andrew J. Turezyn, and Constance S. Huttner, of Skadden, Arps, Slate, Meagher & Flom, Wilmington, and New York City, for defendants J.P. Stevens & Co., Inc., and Conway, Edwards, Mickel, Ponder, Furman, Wearn and Weinberg.

E. Norman Veasey, and Kevin G. Abrams, of Richards, Layton & Finger, Wilmington, and Irwin Warren, Mark G. Krum, and Timothy J. Lawliss, of Weil, Gotshal & Manges, New York City, for

defendants Odyssey Partners, JPS Holding Corp. and JPS Acquisition Corp.

Grover C. Brown, and Henry N. Herndon, Jr., of Morris, James, Hitchens & Williams, Wilmington, and Raymond L. Falls, Jr., and William M. Murphy, of Cahill Gordon & Reindel, New York City, for defendants Burns, Crow, Mitchell, Stevens and Zerrenner.

## OPINION

ALLEN, Chancellor.

West Point–Pepperell, Inc. ("West Point") is currently contesting with affiliates of Odyssey Partners, a New York partnership, for control of J.P. Stevens & Co., Inc. ("Stevens"), a Delaware corporation engaged principally in the production and marketing of textile products of various kinds. Both West Point and Odyssey have tender offers currently outstanding to the shareholders of Stevens. Odyssey's offer, which is made through its affiliates JPS Acquisitions Corp. and JPS Holding Corp. (who together with Odyssey Partners are referred to here simply as "Odyssey"), is for up to all of the Company's stock at $64 per share in cash, subject to certain conditions. That offer may close no sooner than midnight April 11, 1988. The board of directors of Stevens has endorsed and recommended acceptance of the Odyssey offer and has entered into an agreement of merger with Odyssey. The West Point offer is for $62.50 per share cash, although West Point has stated its willingness to pay $64 per share cash in a transaction that the Stevens board would endorse. West Point's offer is not subject to a financing condition and may close no sooner than April 21, 1988.

On March 25, 1988 West Point commenced this action against Stevens, the members of its board of directors, and against Odyssey.

That suit was consolidated with an earlier filed stockholder class action seeking judicial review of the evolving transaction in which Stevens would be sold. Broadly speaking, the complaint [1] alleges that the board, in a course of conduct over the last two months, has breached its fiduciary duty to the Stevens shareholders by repeatedly favoring the Odyssey proposal, by placing expensive impediments in the way of the West Point proposals and ultimately in failing to attempt, in good faith, to achieve the highest available price for the shareholders in a situation in which it is clear that the Company is to be sold. This course of conduct is said to plainly violate the duty of directors as described in the important case of *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1986).

Odyssey Partners and its affiliates are said to have knowingly participated in the alleged wrongs and, as a result, to be jointly liable with the individual defendants for their consequences.

The complaint seeks several forms of relief. First, it seeks a declaratory judgment that certain financial obstacles to another, higher bid by Stevens, which allegedly are created by the amended merger agreement (provisions that provide for reimbursement of expenses and for a so-called "topping fee"), be declared invalid and the Company enjoined from complying with them. Second, the complaint seeks to have this court order that a corrective disclosure be made to rectify certain allegedly misleading statements or omissions in the Company's Schedule 14D–9 filed under the Securities Exchange Act of 1934. Third, it is asked that the court preliminarily enjoin completion of the Odyssey offer for a reasonable but brief period in order to allow dissemination of the corrective disclosure and in order to permit West Point to consider making another, higher, offer with the use of Company confidential information that was, until recently, (allegedly) wrongfully withheld from West Point, but not from Odyssey.

A further description of the legal theories offered to justify this powerful relief and the arguments of defendants that purport to show that no relief is warranted in

---

1. There will be no further reference to the stockholder action, as the arguments made by the class plaintiffs tend to parallel those of West Point.

these circumstances will be deferred until a statement of the pertinent facts as they appear at this time can be set forth.

## I.

1. *Stevens' Board Receives an Unsolicited Leveraged Buy-out Proposal from the Company's Management.*

By late January, 1988, the senior management of Stevens had resolved to attempt to acquire ownership of the Company in a new entity to be formed by them and other investors. There had been earlier studies of this sort of alternative by the Company's long-term investment banker, Goldman, Sachs. Stevens Dep. at 33. On January 27, Whitney Stevens, the Company's chief executive officer, called Virgil Conway, a veteran outside director of the Company and asked if Mr. Conway could interrupt his vacation to attend a special board meeting on February 7th in New York, where the Company's executive offices are located. Conway Dep. at 19–21. Mr. Stevens stated that it was likely that an LBO proposal would be made at that time by a management group.

The February 7 meeting was attended by eleven Stevens directors and by representatives of the Skadden, Arps law firm and the investment banking firm of Goldman, Sachs, both of whom were apparently invited to attend by management. At that time, the Stevens board of directors received a buy-out proposal from Palmetto, Inc., a company formed by members of Stevens' senior management. Palmetto sought to acquire Stevens for $38 in cash and $5 in junior subordinated debentures per Stevens share. The board responded by appointing a Special Committee, comprised of all seven outside Company directors, to consider the Palmetto proposal and to make recommendations to the full Stevens board with respect to it. The Special Committee was also charged to consider and make recommendations with respect to any other available alternatives, including proposals from third parties. A press release disclosing all of this was made on February 9, 1988.

2. *An Auction for Stevens Rapidly Develops.*

On February 23, 1988, after reviewing publicly available financial data, West Point's chairman sent a letter to the Special Committee stating that West Point was considering a proposal that would "yield a price to your stockholders substantially exceeding the price proposed by the management group, as well as the current market price." Lanier Aff. Exh. A at 1. That letter requested that Stevens provide West Point with certain non-public business information and indicated a willingness to enter into an appropriate confidentiality agreement in that connection.

On the advice of the Special Committee's legal counsel, Mr. Conway, who had been named chairman of that committee, did not respond to West Point's February 23 letter, but awaited the next scheduled meeting of the committee, then scheduled for March 1.

On February 29, West Point sent a second letter to the Special Committee in which it proposed that it acquire Stevens for $56 in cash per share for all shares. Significantly, that letter stated that the West Point offer would not be conditioned on the availability of financing and stated that a proposed merger agreement "would contain only customary conditions." Finally, the February 29 letter indicated that $56 was not West Point's final bid. It stated that "all aspects of our proposal, including the price, are open to negotiation."

The next day, following the March 1 meeting, the Special Committee announced the receipt of three bids: the $56 cash bid from West Point; a revised proposal from Palmetto for consideration consisting of $40 in cash, $10 in junior subordinated debentures and $5 of "payment in kind" preferred stock; and a third unidentified bid at a price less than $56. Lanier Aff. ¶ 8. In fact, Odyssey Partners was the third bidder and it had sent to the Special Committee a February 29 proposal contemplating a $51 cash transaction but noting its willingness to consider a higher price if a review of non-public information warranted such an increase.

Since West Point is engaged in some of the same businesses as Stevens—notably the home furnishings textile business (mainly sheets and towels)—evaluation of its proposal involved a consideration of possible antitrust concerns not presented by the other two offers. Based on publicly available information, the committee's legal advisors gave a preliminary view to the committee at its March 1 meeting that a merger between West Point and Stevens would "raise serious antitrust concerns" (Stoll Aff. ¶ 7), that those concerns "might be eliminated by curative divestiture of substantial assets" (*Id.*, ¶ 8), and that, in all events, those concerns might be expected to "delay a merger ... for a substantial period" (*Id.*, ¶ 10). It was there concluded by counsel that specific information concerning West Point's plans would be necessary to better evaluate this risk. The Special Committee directed its legal and financial advisors to contact West Point's advisors to ascertain and evaluate such plans.

This need was not easily satisfied because West Point, who early and consistently expressed a willingness to solve any antitrust problem, could not very well form a specific divestiture plan without knowing just what assets producing what products and accountable for what revenue would be acquired in a successful offer. But this information—disclosed in Stevens' non-public documents—would not be made available unless West Point agreed to a confidentiality and standstill agreement (explained below) which it felt unable to agree to.

Nevertheless, in attempting to address the antitrust concerns, West Point did, on March 3, enter into an agreement in principle with Greenwood Mills, Inc., a South Carolina textile firm, to sell certain Stevens assets to Greenwood. When the Special Committee's lawyers next met with West Point on this subject, on March 9, the details of any such divestiture were not disclosed (perhaps because West Point was still not in a position to have determined them).

### 3. *The Second Round of Bids by West Point, Odyssey and the Management Group.*

Meanwhile, some time in the middle of the week of March 7th, having signed the required confidentiality and standstill agreement, representatives of Odyssey met with the Company's management. At that meeting, Odyssey indicated that management participation in Odyssey's efforts was not required and Mr. Stevens indicated that Palmetto would continue with its efforts to gain control of Stevens. Young Aff. ¶ 5.

Also during that week, the various bidders were advised that the Special Committee would be meeting soon to consider the proposal to acquire Stevens and stated that, if they had anything to say, they should do so by Friday, March 11. Lanier Aff. ¶ 16. On March 11, West Point sent a letter to the Special Committee revising the terms of its earlier acquisition proposal. It now stated that it was prepared to pay $60.50 cash per share. There were no proposals in the letter concerning lock-up arrangements or fees to be paid to West Point if the transaction were agreed to but not consummated because a higher deal came along. Nor were there expense reimbursement provisions. West Point included a proposed form of merger agreement which obligated both sides to use their best efforts to effect the sale of all assets that might be required to be divested to avoid the entry of an injunction against the acquisition, provided that West Point would not be required to commit to any divestiture of assets having a fair market value in excess of $200 million.

Also on March 11, Palmetto, the instrumentality of the senior management group, offered consideration per share of $43 in cash, $10 in market value of junior subordinated debentures and $5 in market value of payment in kind preferred stock. Odyssey now offered $60 per share in cash. Its letter also indicated that it would like to discuss equity participation by the Company's management when the board thought that appropriate. Odyssey, it should be noted, is not an operating company and it has no capacity internally to manage an

enterprise such as Stevens, although some of its investors have a background in the textile industry. Its proposal was subject to arranging financing.

At a meeting of the Special Committee on March 11, its legal counsel, after reporting on the contacts to date concerning the antitrust problem, continued to be of the view that more specific information on a divestiture plan was necessary in order to evaluate the antitrust risk. In response to a question, however, he stated the view that "there was a twenty percent (20%) risk that a West Point transaction would not be consummated." Stoll Aff. ¶ 15.

In a further effort to define the dimensions of this problem, representatives of West Point met with the Special Committee on March 12. West Point now attempted to assure the Special Committee that any antitrust problem with its proposal could easily be dealt with, by announcing that it would agree to divest up to 50% of Stevens' towel production capacity and up to 20% of its sheet production capacity. In addition, West Point's representatives disclosed the identity of the prospective purchaser of the Stevens assets (Greenwood). Also, the agreement in principle was shown to the Special Committee's representatives. On March 13, the Special Committee was given written assurance that West Point would guarantee the financing of the Greenwood purchase of the Stevens assets to be sold under the agreement in principle.

4. *A Third Round of Bidding and the Board Meeting of March 13.*

On Sunday, March 13, West Point sent a letter to the Special Committee enclosing a revised form of merger agreement. That further proposal revised the antitrust compliance provisions of the agreement to require the divestiture of up to 50% of Stevens' towel business, up to 20% of its sheet business and all other assets (not used in the towel or sheet businesses) necessary to avoid the entry of an injunction. In addi-

tion, it offered to pay Stevens $15 million if West Point was ultimately unable to acquire Stevens for any reason other than Stevens' breach or the receipt of a financially superior proposal to acquire Stevens. The West Point proposal continued to contain no provisions for reimbursement of fees, for lock-ups or break up fees or other expenses to be borne by Stevens. Later that same day, after being advised that all bids were required to be sealed, West Point submitted its sealed bid in the amount of $62.50 per share for all Stevens shares.

The Special Committee also received further bids from the other two bidders at that time. Palmetto offered a package for each share consisting of $43 in cash, $10 in junior subordinated debentures and $5 in preferred stock and a non-voting common equity interest in Palmetto which had a projected market value of $4, or $62 in total per share if one accepts Palmetto's financial advisor's view of the value of the various paper components in the proposal. Goldman, Sachs, however, evaluated it as worth less than $60. Odyssey offered $61 in cash, subject, as before, to getting the cash.[2]

At a meeting on March 13, the Special Committee rejected the management proposal in light of Goldman, Sachs' advice as to value. Skadden, Arps' representatives then summarized the results of the meetings concerning antitrust problems and expressed the view that a basis for serious concern existed in that antitrust problems could delay or prevent a merger between Stevens and West Point, notwithstanding the Greenwood agreement in principle, and the undertaking to divest 50% of Stevens' towel production and 20% of its sheet production. Stoll Aff. ¶¶ 18–21; Conway Aff. ¶¶ 22–23.

Goldman, Sachs attempted to quantify a stock market discount for delay of the duration referred to by legal counsel; it expressed the view that a $2–$3 per share

---

**2.** Odyssey had a "highly confident" letter from Drexel Burnham, the famous junk-bond innovator, who, it is claimed, has never disappointed the recipient of such a letter. In all events, Goldman, Sachs advised the Special Committee that "it viewed Odyssey's financing as being firmly committed." Conway Aff. ¶ 21. On April 5th, Odyssey announced that such financing was now in place.

discount could be expected. Stoll Aff. ¶ 25. Goldman, Sachs further opined that the Company could experience losses greater than $15 million if the Odyssey proposal were rejected and the West Point deal failed ultimately to be accomplished. *See* Conway Aff. ¶ 24.

After meeting briefly with West Point's senior management, *see* Lanier Aff. ¶ 22, the Special Committee decided that Odyssey's proposal at $61 per share presented a better deal—more likely to close and to do so sooner—than West Point's $62.50 proposal. Conway Aff. ¶ 29. The Special Committee then authorized its advisors to seek whatever more could be obtained from Odyssey. Further negotiations that night yielded an adjusted proposal of $61.50 per share. The Special Committee also managed to get Odyssey to agree to drop its demand for a "topping fee" and forego reimbursement of expenses if it had not obtained financing commitments by March 18. The committee did accede to the request for a reimbursement of expenses (including substantial expenses involved with raising approximately $1 billion in debt financing) not to exceed ($17 million or $1 per share)

In return for the increase in share price, Odyssey asked that the next quarterly dividend not be paid. The Special Committee and Odyssey compromised by agreeing that a dividend of up to $.30 per share could be declared on April 18, 1988 if shares had not been purchased under an Odyssey tender offer at that time. Conway Aff. ¶ 30. The Special Committee did not go back to West Point to see if it would pay more. To do so, it is said, "would have violated the procedures established by the Special Committee for dealing with the final bids." Conway Aff. ¶ 29.

Shortly after midnight, Stevens' counsel informed West Point's counsel that Stevens had signed an agreement to merge with an unidentified third party bidder; Stevens' counsel refused to divulge the price or other terms of the arrangement. The following morning, Stevens announced in a press release that it had signed a merger agreement with affiliates of Odyssey and that

the acquisition price was $61.50 per share. Lanier Aff. ¶ 24.

On March 15, 1988, Odyssey's affiliates commenced a tender offer for Stevens shares at $61.50 per share. The merger agreement entered into between Stevens and Odyssey contained, as is customary currently, a "fiduciary out" clause permitting the Company to terminate its obligation to effectuate the merger in the event that a higher bid is received. On March 16, West Point again requested access to non-public information that had previously been furnished to Odyssey. The letter stated that the information would be used by West Point's advisors to assist it in determining "whether to propose an acquisition of Stevens on terms more favorable to your stockholders than our earlier $62.50 per share cash proposal." The Special Committee responded that, under the merger agreement, it was obligated to obtain Odyssey's consent before providing any confidential information to West Point and that Odyssey was unwilling to waive its right to object.

5. *West Point Responds With A Public Tender Offer And The Prospect of Yet Another Increase In Price.*

On March 24, 1988 West Point entered into a definitive agreement with NTC Group, Inc. ("NTC"), the parent company of a textile manufacturing firm, that contemplated the sale of a portion of Stevens' towel and sheet manufacturing facilities and related assets. Also on that day, West Point and NTC formed a limited partnership, Magnolia Partners, L.P., for the purpose of making a tender offer for Stevens. That same day, March 24, 1988, Magnolia sent a letter to the Stevens board of directors stating its intention to promptly commence a tender offer for Stevens at $62.50 per share. That letter added, however, that Magnolia would increase its price to $64 per share for an aggregate of approximately $45 million over the then current Odyssey offer, if Stevens entered into a merger agreement with Magnolia by April 5, 1988. The letter noted that the Magnolia offer was not conditioned on financing and that, based on the advice of

West Point's counsel, the arrangement with NTC "eliminated any antitrust concerns" and made it "virtually certain" that the transaction would be consummated.

On March 25, 1988, Magnolia commenced its tender offer, which is not conditioned on financing and is scheduled to expire on April 21, 1988.

On March 25, 1988, West Point commenced this action seeking, among other relief, an order directing Stevens and the Special Committee to maintain a level playing field by furnishing to plaintiffs the same non-public information they had given to Odyssey.

### 6. The Circumstances Concerning Access To Non-Public Information.

Up until late March, West Point had been unsuccessful in gaining access to any non-public information of Stevens. From early in the month, counsel for the Special Committee had refused to make any non-public information available unless West Point first agreed to sign an agreement that contained a standstill provision. That provision would have prohibited West Point for a period of one year from either (a) acquiring or offering to acquire any Stevens voting shares; (b) proposing to Stevens or its shareholders, or publicly announcing, any transaction involving Stevens or its shareholders or seeking control of Stevens through a proxy fight or otherwise (except after a prior written invitation by the Special Committee to make a proposal); or (c) assisting or encouraging any third party in acquiring Stevens shares or assets without the Special Committee's prior written consent. This proposal, however, did contain an exception that would have permitted West Point to make a proposal to purchase all outstanding shares of Stevens common stock if (1) Stevens previously executed a definitive acquisition agreement with a third party; and (2) West Point's bid was higher than that in the third party's contract. *See* Young Aff. Exh. C. Odyssey had signed an agreement of this kind before being afforded access to Stevens' non-public information.

From March 25 to March 28, counsel for West Point and for the Special Committee attempted to negotiate the terms under which West Point might obtain access to Stevens financial information that Odyssey had been provided. No agreement was reached. Then, at 5:30 p.m. on March 28, an agreement was signed giving West Point officers access to Stevens data pursuant to a confidentiality agreement. This confidentiality agreement, while similar to that signed by Odyssey, more specifically identified the circumstances in which West Point could extend proposals to shareholders, without board approval: West Point could make such a proposal if the proposal was for all of the common stock on a fully diluted basis for at least $62.50 per share in cash. Lanier Aff. ¶ 35.

### 7. The March 28 Meeting of the Special Committee to Address Further Possibilities.

As West Point later found out, on that same evening, the Special Committee was meeting yet again, this time to consider a further revised Stevens proposal from Odyssey in response to West Point's suggestion of a $64 price. That revision also provided for Odyssey to receive a "topping fee" of 20% of any amount over $64 that the shareholders ultimately realized (with an $8 million—or $.40 per share—cap), and sought an increase in the reimbursement of expenses from $17 million to $19 million.

Lastly, the amended merger agreement modified the termination provisions of the merger agreement. The merger agreement had provided that the Stevens board could not terminate its agreement with Odyssey unless a higher bid were made by third parties, and then, only after Odyssey had been given seven business days to make an even higher bid itself. The amended merger agreement enhanced this timing advantage by extending the period during which Odyssey can top any competing offer from seven business days after the competing bidder's waiting period under the Hart–Scott–Rodino Act has expired. This provision operates to prevent Stevens from terminating the amended merger agreement at any time during which West

Point is in the Hart–Scott–Rodino filing process, thereby effectively preventing West Point from ever being able to receive Stevens' cooperation in receiving federal antitrust clearance.

The Special Committee's advisors were told by Odyssey that its proposal had to be accepted on the 28th or it would lapse, and that it would be automatically retracted if the committee informed West Point of Odyssey's latest proposal. Before entering into that revised agreement, the Special Committee negotiated the expense reimbursement back down to its previous level and again heard from its legal counsel on the subject of antitrust. He reported that West Point's plan, insofar as he could learn of it after inquiry, continued to involve "significant legal uncertainties" (Conway Aff. ¶ 35); that West Point had not cooperated in seeking Federal Trade Commission guidance (Stoll Aff. ¶ 29); and that West Point refused a contract provision obligating it to divest whatever assets the Federal Trade Commission found to be problematic from an antitrust perspective.

The Special Committee, and thereafter the board, approved the revised proposal. It concluded that the risks presented by the antitrust concerns continued to render West Point's proposal less advantageous to Stevens shareholders. It did not go back to West Point to inquire whether it would pay yet more. The revised merger contract does, however, contain a "fiduciary out" clause and the board remains free to accept a bona fide higher offer.

### 8. *West Point's Expressed Interest In Raising Its Bid.*

West Point has not raised its tender offer to $64, but it has expressed willingness to do so. It has further represented in court that if the court strikes down the reimbursement of fees provision and the topping fee provision, it will further increase its offer to pay to shareholders the amount that would otherwise be paid by the Company to Odyssey under those provisions.

## II.

In order to grant a preliminary injunction, it is necessary for the court to conclude that plaintiff has established a reasonable probability of ultimate success on the claims asserted, that, absent such relief, plaintiff is faced with a prospect of irreparable injury that will occur before final judgment is likely to be reached, and that, in balancing the overall equities present, no likely untoward consequence to the defendant or to other legitimate interests affected, outweighs the threat of irreparable harm to the plaintiff. *See Ivanhoe Partners v. Newmont Mining Corp.*, Del.Supr., 535 A.2d 1334 (1987). For the reasons stated below, I find it unnecessary to address any aspect of this matter other than the probability of ultimate success on the merits of the claims asserted.

## III.

It seems hardly an exaggeration to say that plaintiffs' argument—highly textured and specific as it is—begins and ends with the Delaware Supreme Courts's opinion in *Revlon.* It is contended that it is incontestably true that Stevens is for sale and that, in that circumstance, the directors' duty is simply to get the highest available price. That duty, it is said, was violated in at least three specific ways. First, non-public information was kept from West Point while provided to other bidders. This created problems for West Point that ultimately provided the pretext for the directors selecting a lower bid in the face of West Point's higher bid. Second, the reimbursement of expenses provision agreed to on March 13 ($1 per share) is said to have impermissibly impeded the auction process and to have constituted a breach of duty. Third, it is said that the topping fee agreed to on March 28 also acted to impede the auction and thus, under the teaching of *Revlon*, to have constituted a breach of duty.

Two very different arguments can be and are made by applying some reading of *Revlon* to these facts. First, *Revlon* can be seen as a case essentially involving a board that, if not disloyal to shareholder

interests, was in a conflict situation. This divided loyalty (divided, that is, at the least between note holders and the stockholders, *see* 506 A.2d at 184, and perhaps between management and shareholders, *see, e.g., MacAndrews & Forbes Holdings, Inc. v. Revlon, Inc.,* Del.Ch., 501 A.2d 1239, 1249 (1985): "What motivated the Revlon directors to end the auction with so little objective improvement?") justified the court, under conventional doctrine, in reviewing the substantive fairness of the various board actions there taken. Alternatively, *Revlon* may be viewed as a case in which a finding of divided loyalty did not play a critical part. On this view, the case establishes some rules about the kind of agreements that may not be entered during an auction for corporate control (*e.g.,* those that will stop the bidding or will favor one bidder over another) even by a disinterested, fully functioning board or, at the least, will call forth active judicial review of the wisdom or fairness of such contracts.

In this action, the class action plaintiffs emphasize the alleged bad faith of the Special Committee which would fit their conception within the first view of *Revlon,* and West Point emphasizes the second view of *Revlon.* It is, therefore, appropriate to return to the facts of this case to assess whether it now appears reasonably likely that it might be found that the Special Committee's actions were infected with an inappropriate motivation, as plaintiff contends. After resolution of that matter, we will return to the second view of the law described above.

### IV.

The description of the facts set forth above reflects a view derived from the depositions and affidavits submitted on the motion. It is, of course, not complete, but in many respects the foregoing is not contested. The question of the Special Committee's good faith or motivation is a factual matter that is critically important and most warmly contested, however.

West Point's essential position factually is that the Special Committee acted throughout to protect the interests of the Company's management. In the face of offers clearly better than Palmetto's offer, it could not endorse a Palmetto proposal, but it could do the next best thing. It could push the transaction towards Odyssey. Odyssey would be regarded by management as greatly to be preferred over West Point because Odyssey (a) had no real capacity to run Stevens, (b) had indicated it wanted the current management to stay on, and (c) had indicated a willingness to discuss equity participation by management. Thus, Odyssey, rather than being an arm's-length bidder, as West Point is, appears in this version to be a white knight, favored by management and by a Special Committee that vibrates sympathetically to management's desires. Maybe that is true; it surely is plausible. For example, one is left with the suspicion that the need to reach a final decision may not have been so great as to require the Special Committee to decide by March 13th to sign a merger agreement, when another month might have resolved the antitrust question that presented the reason for preferring a lower offer. And if one is inclined to second guess board decisions, the decision to agree to a $1 per share break-up payment on March 13 seems a likely candidate for review. Odyssey had just submitted a proposal materially *lower* than West Point. If Odyssey really wanted to acquire the Company, how much leverage did it have, in those circumstances, to insist on a $17 million break-up fee? So the claim that the real purpose of that fee provision was to disadvantage West Point is not altogether hollow. And why did the Special Committee so easily accept Odyssey's threat to retract its March 28th $64 offer, if it was not accepted immediately? Would not the practicality of the matter suggest to the Special Committee that if Odyssey was willing to pay $64 on the 28th, it would be willing to do so a few days later?

Other legitimate questions could be asked, but, in the end, plaintiffs' plausible story is not, in my opinion, sufficiently supported by the evidence at this time to permit the conclusion that it is reasonably likely that at trial it would be found that

the Special Committee sought to promote the interests of management by advantaging Odyssey at the possible expense of the shareholders. There is no direct evidence of bad faith. The Special Committee did negotiate the reimbursement provision down on March 28 and successfully resisted the request for a topping fee when it was first presented on the 13th. While the topping fee has a negative aspect from the shareholders' point of view, as more fully explained below, if one could conclude that Odyssey would stick on that point, then it clearly, on balance, was a benefit to shareholders. Moreover, the fact that the Special Committee meets all of the formal or structural characteristics of a board that is properly functioning—it is comprised of persons without a financial conflict of interest, it is well advised and appears diligent in carrying out its mission—means that something more than the suspicions upon which West Point's plausible account is based is necessary to conclude that bad faith is likely to be found here.

Accordingly, I decide the pending motion on the basis that the Special Committee in fact acted in good faith in conducting the auction process that commenced on February 23rd.

## V.

Given the inability to conclude provisionally at this stage that the Stevens board, functioning through its Special Committee, was inappropriately motivated in conducting the auction, the question becomes, in my mind, whether its actions in granting to Odyssey the contract rights in question are protected by the business judgment rule. *See Pogostin v. Rice,* Del.Supr., 480 A.2d 619, 627 (1984); *Revlon,* 506 A.2d 173, 180; *Buffalo Forge Co. v. Ogden Corp.,* 717 F.2d 757 (2d Cir.1983). In that connection, I note preliminarily that, as currently viewed, this case involves neither a self-dealing transaction, *see, e.g., Weinberger v. UOP, Inc.,* Del.Supr., 457 A.2d 701 (1983),

nor corporate measures designed to defeat a threatened change in control, *see Unocal Corp. v. Mesa Petroleum Co.,* Del.Supr., 493 A.2d 946 (1985); *Ivanhoe Partners v. Newmont Mining Corp.,* Del.Supr., 535 A.2d 1334 (1987). Thus, I do not regard myself as authorized by *Unocal* or any other precedent of this court or the Supreme Court to pass upon the reasonableness of the judgment to grant the topping fee or the expense reimbursement provision, except in one respect.

Stated generally, the business judgment rule provides that a decision[3] made by an independent board will not give rise to liability (nor will it be the proper subject of equitable remedies) if it is made in good faith and in the exercise of due care.[4] This means that ordinarily the policy of the rule prevents substantive review of the merits of a business decision made in good faith and with due care. These are, of course, good reasons to minimize such substantive review. As I recently had occasion to note:

> Because businessmen and women are correctly perceived as possessing skills, information and judgment not possessed by reviewing courts and because there is great social utility in encouraging the allocation of assets and the evaluation and assumption of economic risk by those with such skill and information, courts have long been reluctant to second-guess such decisions when they appear to have been made in good faith.

*Solash v. Telex Corp.,* Del.Ch., C.A. Nos. 9518, 9528, 9525, Allen, C. (Jan. 19, 1988) [Current] Fed.Sec.L.Rep. (CCH) ¶ 93,608, at 97,727 (Del.Ch., Jan. 19, 1988) [available on WESTLAW, 1988 WL 3587].

A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than

---

**3.** *See Aronson v. Lewis,* Del.Supr., 473 A.2d 805 (1984) and Arsht, *Fiduciary Responsibilities of Directors,* 4 Del.J.Corp.L., 652, 659 (1979), with respect to the requirement that a conscious deci-

sion to act or to refrain from action is a necessary factor for the invocation of the doctrine.

**4.** As to the appropriate standard of care, *see Aronson v. Lewis, supra.*

bad faith.[5] As shown below, I have considered the substance of the decision to grant the rights here in question, in the context of all of the circumstances, to the limited extent necessary to see if they are so beyond the bounds of reasonable judgment in the circumstances as to give rise to an inference of bad faith.

■ Accordingly, if *Revlon* is explained as a breach of loyalty case (*i.e.*, one in which the board appeared not to be acting in good faith for the shareholders' benefit), which is how I read it, the provisional finding of good faith in this case is a critical difference between that case and this one. That finding, moreover, supplies one of the critical elements to the application of the business judgment rule. Given the standard of care required of directors (*see Aronson v. Lewis*, Del.Supr., 473 A.2d 805 (1984)) and the apparently attentive and conscientious way in which the Special Committee carried out, or I should say, is carrying out its duties, I cannot conclude that plaintiffs have shown a reasonable likelihood of success on a claim that the defendant directors have violated their duty of care or of loyalty.

## VI.

West Point does not, however, make its argument in business judgment terms. Its principal argument is that the reimbursement of expenses provision in the amended merger agreement and the "topping" fee provision in that agreement are both invalid because they contravene a duty recognized by the Delaware Supreme Court in *Revlon* that arises once it is apparent that a change in control of the corporation is to

occur. That duty is said to be a duty to act, in that setting, only to get the highest possible price for the shareholders and for no other purpose. More to the point here, West Point claims that *Revlon* mandates that once an auction process for corporate control is in progress, no action may be taken by a board that would tend to impede the achievement of the highest possible price for the shareholders. A further extension of the proposition that West Point urges is that it is the duty of the board in that setting to keep a "level playing field" among potential bidders and, at least where both are offering cash, not to favor one over another.

It is said that the reimbursement provision and the topping fee provision together have the effect of saddling the Company with up to $1.40 per share in additional liabilities and, thus, of precluding West Point, or any other bidder, excepting Odyssey, from paying to the shareholders the top price it might otherwise be willing to pay for acquisition of all the Company's shares. Since a "topping" fee arrangement and the reimbursement of expenses will, it would seem, inevitably have such an effect, it would seem a logical inference from West Point's position that, where an auction process is going forward, such provisions will inevitably offend the principles of the *Revlon* case, as so understood. I do not so understand that case, however.

*Revlon* recognizes that once a change in control is concededly in the works, the responsibility of the board is limited to a facilitating and achieving the best possible transaction for the shareholders.[6] *Revlon*, however, does not purport to restrict the

---

5. This "escape hatch" language has been variously stated in the Delaware opinions: "egregious" decisions are said to be beyond the protections of the business judgment rule, (*Aronson v. Lewis, supra* at 805), as are decisions that cannot "be attributed to any rational business purpose" (*Sinclair Oil Corp. v. Levien*, Del.Supr., 280 A.2d 717, 720 (1971)), or decisions that constitute "a gross abuse of discretion" (*Warshaw v. Calhoun*, Del.Supr., 221 A.2d 487 (1966)). *See also Kaplan v. Goldsamt*, Del.Ch., 380 A.2d 556, 567 (1977); *Gimbel v. The Signal Companies*, Del.Ch., 316 A.2d 599, 610 (1974) ("... inadequacy ... so gross as to display itself as a badge of fraud"); *Marks v. Wolfson*, Del.

Ch., 188 A.2d 680, 685 (1963) ("... price ... for the sale of ... assets was so clearly inadequate as constructively to carry the badge of fraud").

6. That, of course, does not mean that material factors other than "price" ought not to be considered and, where appropriate, acted upon by the board. Such consideration might include form of consideration, timing of the transaction or risk of non-consummation. Thus, although it hardly needs to be said, the Special Committee was entirely justified in considering any legitimate threat that the antitrust laws posed to the consummation of any West Point proposal.

powers of a disinterested board from entering into agreements of the kind here under attack if, in doing so, the board acts in good faith and with appropriate care. While it is true, that once agreements of this kind are in place, they do have the effect of tilting the playing field in favor of the holder of such rights, that fact, alone, does not establish that they necessarily are not in the best interest of shareholders. It is the shareholders to whom the board owes a duty of fairness, not to persons seeking to acquire the Company. To continue with the metaphor, the board may tilt the playing field if, but only if, it is in the shareholders' interest to do so.

The circumstances of the agreement on the topping fee arrangement in this case conclusively demonstrate the fact that an agreement that has the effect of advantaging one bidder may, in some circumstances, benefit shareholders, at least if one assumes that the request for such a topping fee provision was a material part of the consideration inducing Odyssey to make its March 28 proposal. While this seems apparent, it might nevertheless be useful to dilate upon it for a moment.

As of March 28, the Special Committee had in hand a merger agreement contemplating $61.50 cash per Stevens share. It also had an indication that another bidder, West Point, was willing to go to $64 per share. There were no other bidders willing to compete at levels above $61.50. Failure to get Odyssey to increase its offer to $64 would have meant that, even if the Special Committee could have succeeded in getting West Point to legally commit itself to a $64 deal, there was no reasonable prospect for another bidder forcing the bidding beyond that point. If, however, Odyssey could be induced to increase its offer to $64, two

bidders were left in the game willing to pay at least that price.[7] A prospect for a price greater than $64, thus, still remained. It therefore appeared critical, in order to possibly achieve a price *in excess* of $64, to get Odyssey up to that price. If, in order to do so, it required a topping fee calculated as a percentage of amounts realized above $64, it was not unreasonable for the Special Committee to conclude that the shareholders could only gain by granting that fee and could lose nothing. The shareholders would end up, on say March 29th, with a committed cash deal at $64, the highest price that anyone had suggested up until that time, and would maintain a prospect for further bidding among two still-active candidates. Failure to get Odyssey to $64 would have terminated the matter with West Point's $64 bid (assuming it could be realized should Odyssey be seen as unwilling to go above $61.50).

Thus, even though the topping fee provision clearly does have the effect of favoring Odyssey in the bidding and may preclude West Point from offering a price that it might otherwise offer, that provision is not, in my opinion, inconsistent with the board's duty to seek the best available transaction for the shareholders and to seek no other purpose.[8]

West Point, however, claims that the factual predicate for an analysis of this kind is flawed. It claims that Odyssey never asserted that the topping fee agreement was a condition to its raising its offer and that, unless one concludes that it was such a condition, the granting of the topping fee amounts to, in essence, a form of waste. That is, there is no valid justification for it unless one concludes that it was an essential term from Odyssey's point of view.

7.  To sign up with West Point at $64 would not have left the Special Committee in an analogous position vis-a-vis Odyssey, since it had not indicated a willingness to go to $64 yet.

8.  West Point's point that a provision of this kind is either invalid or particularly suspect when it is given to an *existing* bidder because such a bidder (presumably in fact? perhaps as a matter of law?) does not need to be encouraged to participate in the bidding process, is faulty as a matter of logic. If an existing bidder will not

participate further in bidding without some special consideration, and it is in the shareholders' interest to keep that bidder participating, it hardly matters that the consideration is flowing to one who had previously been involved and, but for the consideration, would not be involved further. In all events, without the inducement, the shareholders are left without a bidder and perhaps no auction, or at least a reduced likelihood of a continued auction.

West Point adds, of course, that the real justification was a desire to favor Odyssey so that it would prevail in the contest, which was a result that the management of Stevens would prefer.

But with this argument, West Point inescapably enters the zone of the business judgment rule. If there were no basis for the Special Committee to conclude that the topping fee was a material term in Odyssey's proposal, then it would be difficult to understand what proper corporate purpose would be served by granting it.[9] I cannot conclude, however, that the Special Committee could not, in the circumstances, reasonably conclude that the topping fee was indeed a material element of the consideration inducing Odyssey to increase its bid. A provision of this kind had once before been sought by Odyssey, but the Special Committee had resisted it in connection with the March 13 Odyssey proposal. It was again included in the March 28 proposal. The board's advisors were told (and I think it is fair to infer that they reported to the Special Committee) that that offer had to be accepted on March 28 in order for such acceptance to be binding upon Odyssey. In these circumstances, reasonable directors, exercising honest, informed judgment, might differ as to what course of action would most likely maximize shareholder interests. One could have gone back to Odyssey and sought to negotiate not only the requested increase in reimbursement fees (which was done), but also the topping provision. Alternatively, it was not beyond the range of reasonable responses, in the circumstances in which the overall objective at that time was to get a committed deal at $64 per share cash from Odyssey, to accept that provision in an effort to achieve that objective. These are precisely the sort of debatable questions that are beyond the expertise of courts and which the business judgment rule generally protects from substantive review for wisdom. Certainly, the decision to accede to the topping fee in these circumstances does not fall so far afield of the expected range of responses to warrant an inference that the Special Committee must have been motivated by a concern other than maximizing the value of shareholders' interests. In so concluding, I find relevant the specific terms of the fee formula, its cap, and the time when in the bidding process it was agreed to, together with all other surrounding circumstances.

The foregoing treats the topping fee. But similar considerations govern the other contractual impediment to West Point's higher bid—the break-up fee. As to that $17 million termination fee, I can perceive no basis at this time to conclude that, in agreeing to it, the board (or the Special Committee) breached a duty to seek to achieve the best available deal for the shareholders. Such agreements are reasonably conventional and are, of course, not invalid per se. *Revlon* at p. 183. They may, of course, be struck down when they are the product of disloyal action (*see Edelman v. Fruehauf Corp.*, 798 F.2d 882 (6th Cir.1986)), or, conceivably, if they are the product of a grossly negligent process. *Hanson Trust PLC v. ML SCM Acquisition, Inc.*, 781 F.2d 264 (2d Cir.1986). But if, as appears to be the case here, such a provision is negotiated in good faith by a board with no apparent conflict, that is well-advised and follows a responsible, deliberate procedure, I am at a loss as to know what basis exists for declaring such a provision a violation of shareholders' rights. The only colorable argument offered (other than the factual argument that the Special Committee was operating in bad faith) is that, where an auction for the Company is on-going, the board has a duty —not to exercise its judgment as to what is in the shareholders' interest with respect to a proposal made to it—but to steadfastly refuse to agree to such a provision, since to do so will create an impediment of some size to other bidders.

To create such an impediment is offensive to the level playing field metaphor but to what principle of law does it necessarily give offense? Assuming a properly motivated, independent board acting deliberately, in my opinion, it gives offense to no

---

**9.** *See* cases and text at note 5, *supra*.

right of shareholders. In *Revlon,* this court did restrain the implementation of a break-up fee provisions as did the Sixth Circuit Court of Appeals in *Fruehauf.* But in each of those instances, the courts concluded that the board was not properly motivated, that in each case, the board sought not to exercise judgment for the shareholders' benefit but to exercise power for the benefit of others. *See Revlon* at 182–184; *Fruehauf,* 798 F.2d at 885. As I cannot conclude that the Special Committee has not been properly motivated here (or that it acted on an uninformed basis, *cf., Hanson Trust PLC v. ML SCM Acquisition, Inc.,* 781 F.2d 264, 277 (2d Cir.1986)), I cannot conclude that its judgment to agree to the inclusion of the $17 termination fee in the context of the March 13th contract or the later amended merger agreement; as curious as I find it to be, at least in the March 13th setting (*see* p. 779, *supra* ), was a wrong to shareholders.

## VII.

■ With respect to the claim that Stevens' insistence upon the particular form of standstill agreement before disclosing non-public information itself constituted a form of preference for Odyssey that was improperly motivated and a wrong in the light of *Revlon,* I can find no reasonable probability of success at this time. First, the non-public documents were offered to all bidders on the same terms. There is no sufficient basis in the record developed to date to believe that there was an undisclosed agreement or arrangement with Odyssey to assure to it different treatment under that agreement than West Point could expect. Second, after admittedly only a preliminary view of the terms of the standstill agreement, I am not inclined to agree with the broad interpretation that West Point would accord that document. I am, therefore, unimpressed with the argument that West Point was, in effect, forced unfairly to conduct its campaign without data that others had access to. In all events, I find no sufficient basis to conclude at this time that the Special Committee utilized the standstill agreement for an inequitable purpose—such as the favoring of Odyssey despite the interests of shareholders—and thus find no basis for equitable relief from the consequences of West Point's refusal to agree to its terms.

## VIII.

■ I turn then to a remaining claim not previously adverted to: that Stevens has breached a state law duty by distributing to its shareholders a Schedule 14D–9 filing that was not true and complete. A Schedule 14D–9 is filed pursuant to the Federal Securities Exchange Act of 1934. Two forms of relief are requested with respect to this claim: corrective disclosure and an injunction against Odyssey's closing its tender offer until the corrective disclosure is made—this latter relief on the theory that Odyssey is a co-conspirator or aider and abettor of Stevens' 14D–9 based state law violation.

These points were not mentioned at oral argument, but I assume that, having been made in the briefs, West Point wishes to press them. I have reviewed the claimed non-disclosures—and assuming for these purposes that a legal duty of the kind posited exists—my initial reaction (and the time available permits little else) is that they do not present major difficulties when viewed in the light of the appropriate legal test. *See Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929 (1985). But I do not place my decision upon that basis, but rather upon other elements of the preliminary injunction test.

Specifically, it follows from the conclusion that the Special Committee has not been shown to have acted in bad faith (or more precisely, that it has not been shown to be likely that at final hearing such a determination will be made) that Odyssey has not been shown to have conspired with the Special Committee. I see, therefore, no basis to enjoin Odyssey from exercising *its* rights under its tender offer documents.

Moreover, the rights of tendering Stevens shareholders must be taken into account when the request is to enjoin the closing of a tender offer. *See Freedman v. Restaurant Associates Industries,*

Del.Ch. [current] Fed.Sec.L.Rep. (CCH) ¶ 93,502 (October 16, 1987) [available on WESTLAW, 1987 WL 14323]; *Hecco Ventures v. Sea–Land Corp.*, Del.Ch., C.A. No. 8486, Jacobs, V.C. (May 19, 1986) [available on WESTLAW, 1986 WL 5840]. There are reasons that would suggest to a rational shareholder that the Odyssey offer is preferred—it is higher at this point and, if the Special Committee's counsel is correct, more likely to close and sooner. Thus, enjoining Odyssey's offer would threaten possible injury to Stevens shareholders and that fact would bear importantly upon the propriety of issuing an injunction of the kind sought.

\*     \*     \*

The remedy for West Point, if there is to be one, will, so far as this court is involved at least, be afforded by the market. It has time to make an offer that is better than Odyssey's current offer. West Point's invitation to this court to facilitate a higher offer by striking down the provisions negotiated by the Special Committee will be declined, even though to act on that suggestion would financially benefit shareholders. While the court is protective of shareholder rights, shareholders possess no right in equity to rescind a valid corporate agreement simply because to do so would redound to their financial benefit. Concluding on the limited record available that the agreements in question appear to be the product of valid board action, I see no justification for relieving the shareholders of their consequences now.

The pending application will be denied. IT IS SO ORDERED.